**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 17, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

GARY CLARK,

      Plaintiff - Appellant,

v.

ROBERT COLBERT, in his official and individual capacity as Sheriff of Wagoner County, Oklahoma; WAGONER COUNTY BOARD OF COUNTY COMMISSIONERS; DUSTIN DORR, in his individual capacity; and VICKI HOLLAND, in her individual capacity,

      Defendants - Appellees.

No. 17-7046

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**
**(D.C. NO. 6:16-CV-00115-JHP)**

---

J. Spencer Bryan (Steven J. Terrill with him on the briefs), Bryan & Terrill Law, PLLC, Tulsa, Oklahoma, for Appellant.

Stephen L. Geries, Collins Zorn & Wagner, P.C., Oklahoma City, Oklahoma, for Appellees Board of County Commissioners of the County of Wagoner and Vicki Holland.

Randall J. Wood (Robert S. Lafferrandre and Jessica L. Dark with him on the brief), Pierce Couch Hendrickson Baysinger & Green, L.L.P., Oklahoma City, Oklahoma, for Appellee Robert Colbert.

---

Before **TYMKOVICH**, Chief Judge, **BALDOCK** and **HOLMES**, Circuit Judges.

———————

**TYMKOVICH**, Chief Judge.

———————

This case involves an encounter between law enforcement and a schizophrenic individual suffering a psychotic episode. Officers from the Wagoner County Sheriff's Department responded to a call from Gary Clark's brother, who was having troubling restraining him. The Sheriff's Department, in turn, requested help from the neighboring Broken Arrow Police Department. The Broken Arrow officers tried to subdue Clark through nonlethal means. Those means failed. The officers thus resorted to lethal force, shooting Clark as he charged them with a large kitchen knife. Clark ultimately survived his gunshot wounds, but still has not fully recovered.

Clark now brings this lawsuit claiming numerous violations of his constitutional, federal-statutory, and state-common-law rights. As relevant here, the district court granted summary judgment to the Wagoner County Board of Commissioners, Wagoner County Sheriff Robert Colbert, and former Wagoner County Jail Nurse Vicki Holland on Clark's claims against them.

We affirm. Given the undisputed facts, a reasonable jury could not find the officers violated Clark's Fourth Amendment right to be free from excessive force. In addition, Clark has failed to adequately brief issues necessary to justify reversal on his Oklahoma-tort and Americans with Disabilities Act (ADA) claims.

-2-

Finally, Clark has not marshaled evidence sufficient to prove he received constitutionally inadequate medical care while incarcerated.

## I. Background

We recount the facts in greater detail as they relate to our analyses of the specific claims at issue. In broad strokes, however, this lawsuit arises from the arrest and detention of Gary Clark. Clark suffers from schizophrenia. His brother helps him manage his illness. As part of this arrangement, Clark lives in a small cottage on his brother's property in Wagoner County, Oklahoma. On August 18, 2014, Clark's brother went to check on Clark in the cottage. Caught in the midst of a psychotic episode, Clark lunged at his brother with a large kitchen knife, causing a small cut. Clark's brother called the Sheriff's Department. In the ensuing confrontation between Clark and local law enforcement, the officers used progressively severe tactics to secure Clark's arrest. This culminated in the officers shooting Clark as he charged them with the knife. Clark was taken to the hospital for emergency care. He later received ongoing medical attention as he recovered from his wounds in the Wagoner County Jail.

Following his release, Clark sued. He raised numerous claims stemming from his arrest and incarceration, five of which relate to this appeal. *First*, Clark alleged Wagoner County Sheriff Robert Colbert—in both his personal and official capacities—violated Clark's Fourth Amendment right against unreasonable

seizures. *Second*, Clark claimed a right to recover against the Wagoner County Board of Commissioners under Oklahoma tort law for the same police conduct. *Third*, Clark claimed entitlement to relief from the County Board under the ADA for the Board's alleged failure to properly train its officers to accommodate mentally ill arrestees. *Finally*, Clark claimed a right to recover from Nurse Practitioner Vicki Holland for her allegedly inadequate treatment of his injuries in the Wagoner County Jail.

## II. Analysis

Clark contends the district court erred in granting summary judgment on his claims of excessive force, Oklahoma tort liability, ADA liability, and inadequate medical treatment.

We review district court grants of summary judgment de novo. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). In so doing, we ask the same question the district court asked: Has discovery yielded a "genuine dispute" of "material fact" or is the moving party "entitled to judgment" on the claim at issue without any need to weigh evidence? Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A genuine dispute arises where the available evidence would allow a rational jury to accept either party's allegation of a particular fact. *See Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013). But only facts that "could have an effect on the outcome" of a claim

qualify as "material." *Id.* (quoting *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000)). We construe all evidence and draw all inferences in the nonmovant's favor at this stage. *See, e.g.*, *EagleMed LLC v. Cox*, 868 F.3d 893, 899 (10th Cir. 2017).

With that standard of review in mind, we turn to Clark's claims.

## A. The Excessive Force Claim

The Fourth Amendment prohibits state and federal governments from making "unreasonable . . . seizures." U.S. Const. amend. IV; *see Terry v. Ohio*, 392 U.S. 1, 8, 27 (1968) (applying the Fourth Amendment unreasonable seizure provision to the states through the Fourteenth Amendment). When state police violate this guarantee by using excessive force, federal law provides a right of action to the victim. *See* 42 U.S.C. § 1983; *Graham v. Connor*, 490 U.S. 386, 395 (1989); *see also Cordova v. Aragon*, 569 F.3d 1183, 1188 (10th Cir. 2009) (applying *Graham*).

But an excessive force claim must clear the Fourth Amendment's "'objective reasonableness' standard." *Cordova*, 569 F.3d at 1188. That standard asks whether the police employed objectively reasonable force given the totality of the circumstances. *See Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1313 (10th Cir. 2009). We apply this test with an eye toward "balancing . . . 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against

the countervailing governmental interests at stake.'"  *Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)).

We look to the specific circumstances of the confrontation in evaluating these interests.  *See, e.g.*, *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam); *Estate of Larsen v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008); *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995).  And the Supreme Court has itself highlighted the importance of (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396.  Nevertheless, the test is ultimately holistic and open-ended.  *See Cty. of L.A. v. Mendez*, 137 S. Ct. 1539, 1546 (2017); *Tenorio v. Pitzer*, 802 F.3d 1160, 1164 (10th Cir. 2015).  Importantly, though, the fact-finder must adopt "the perspective of a reasonable officer on the scene, rather than [assuming] the 20/20 vision of hindsight."  *Graham*, 490 U.S. at 396.

Clark has sued Sheriff Colbert in both his personal and official capacities for the police officers' use of force in this case.  Clark's failure to prove an underlying constitutional violation, however, justifies summary judgment on both claims.  *See, e.g.*, *Porro v. Barnes*, 624 F.3d 1322, 1325, 1328 (10th Cir. 2010).

The undisputed facts show that no Fourth Amendment violation occurred. On the day of the incident, the Wagoner County Sheriff's Department responded

to Clark's brother's call for help first. Sheriff's Deputies Robbie Lively and Jason Hathcoat arrived at the Clark residence just before 4:00 p.m. They confronted an irritated Clark standing on the front porch of his cottage with a long kitchen knife in hand. Their attempts to communicate with Clark failed. Rather than submit to arrest, Clark made obscene and threatening gestures toward the officers. The Wagoner County deputies did not use force against Clark at this time. Instead, after the arrival of Major Dustin Dorr, the Wagoner County force requested assistance from the Broken Arrow Police Department.

The Broken Arrow officers arrived roughly ten minutes later. Upon their arrival, the Broken Arrow officers began planning and implementing an arrest strategy. As requested, they had brought with them an array of nonlethal resources for accomplishing arrests. Broken Arrow Captain Patrick DuFriend decided the officers would first fire on Clark with a pepperball launcher. This device uses compressed gas to propel small, round projectiles that burst open on impact, releasing a pepper-spray-like irritant from a distance. *See Nelson v. City of Davis*, 709 F. Supp. 2d 978, 982 (E.D. Cal. 2010), *aff'd*, 685 F.3d 867 (9th Cir. 2012). In the event the pepperballs provoked Clark rather than subduing him, Captain DuFriend directed the officers to use their tasers. The officers also had firearms available for use if necessary.

At Captain DuFriend's direction, the officers formed into a half-horseshoe around Clark's front porch. They again commanded Clark to drop his knife and

submit to arrest. When Clark did not comply, Captain DuFriend directed another Broken Arrow officer to begin firing pepperballs.

But the pepperballs did not subdue Clark. Instead, Clark charged the officers with knife still in hand. The officers tried to tase Clark, but failed. They thus discharged their firearms. Clark sustained several gunshot wounds, but was ultimately apprehended and taken to the hospital for emergency care.

Clark concedes the use of the pepperball launcher is the *only* possible basis for an excessive force finding in this case. *See* Aplt. Br. at 14. And indeed, the officers used their tasers only after Clark charged them with a knife, and employed lethal force only after the tasers failed. Accordingly, we focus our inquiry on the reasonableness of deploying pepperballs in this scenario, given the totality of the circumstances. We conclude no reasonable juror could find this force excessive, and thus affirm summary judgment in Sheriff Colbert's favor.

As an initial matter, Clark essentially argues that the officers had no reason to use force *at all* in this situation, so any use of force would have been unreasonable. *See, e.g.*, Aplt. Br. at 34. Yet Clark's failure to drop the knife and submit to arrest—whether a manifestation of his illness or not—left the officers little choice but to use *some* physical force against him. Even if Clark ultimately was not guilty of a crime, his brother's phone call indicated incapacitation was necessary. And because Clark had already attacked his brother with a dangerous weapon, the officers reasonably treated him as a threat to himself and others.

Moreover, because Clark was not responding to verbal commands, the officers' resort to physical coercion could not be categorically unreasonable. *See A.M.* ex rel. *F.M. v. Holmes*, 830 F.3d 1123, 1151 (10th Cir. 2016); *see also Estate of Redd* ex rel. *Redd v. Love*, 848 F.3d 899, 910 n.19 (10th Cir. 2017) (noting police officers may, where necessary, "use their weapons to control a situation").

The officers did not employ a particularly extreme means of coercion either. On the contrary, they treated Clark with caution, using relatively mild, nonlethal tactics in their initial efforts to subdue him. Clark argues even the pepperballs were unreasonable because he was "contained." Aplt. Br. at 22; *see id.* at 34, 36. But the option to utilize more violent tactics as a contingency if a suspect attempts to flee will not render unreasonable *all* less-severe physical means of control.

If anything, the unattractiveness of more coercive alternatives makes the officers' decision *more* clearly reasonable. Using pepperballs likely seemed more humane in the moment than waiting the situation out or spending valuable time tracking down someone who could better communicate with Clark. *Cf. Fisher v. City of Las Cruces*, 584 F.3d 888, 894 (10th Cir. 2009) (noting police often must make hurried decisions and need not limit themselves to the "least intrusive means" available (quoting *Marquez v. City of Albuquerque*, 399 F.3d 1216, 1222 (10th Cir. 2005)). We will never know how long they would have had to wait for Clark to change the status quo, or whether that change would be for better or

worse. By promptly creating and implementing a plan of escalation, the officers avoided the split-second decision of how to capture Clark if he did try to run. *Cf. City & Cty. of S.F. v. Sheehan*, 135 S. Ct. 1765, 1775 (2015) (acknowledging the danger of delay in the arrest context).

Finally, the fact that Clark was experiencing a psychotic episode cannot itself prevent summary judgment. Clark's illness factors into our analysis only as one circumstance in the totality. And though we have held police officers can incur liability for "reckless" conduct that begets a deadly confrontation, *see Allen v. Muskogee*, 119 F.3d 837, 841 (10th Cir. 1997), that is not what happened here. No reasonable juror could find the officers' use of pepperballs to be a reckless provocation. *Cf. id.* (holding an excessive-force claim might be sustained if the claimant could prove police ran—weapons drawn and screaming—up to an armed, suicidal suspect). At best, the officers wrongly predicted how Clark would react to the pepperballs. To say they should have known the plan would create a need to shoot Clark is to indulge in the very sort of hindsight revision the law forbids. *See Graham*, 490 U.S. at 396; *cf. Sheehan*, 135 S. Ct. at 1775 (discussing a similar use of pepper spray that led to lethal force).

This analysis compels affirmance of the district court's Fourth Amendment ruling. For Sheriff Colbert to be liable in any capacity for a violation of Clark's constitutional rights, Clark must show his constitutional rights were, in fact, violated. *See* 42 U.S.C. § 1983. He has failed to produce sufficient evidence of

that fact.  The officers in this case confronted an armed and irate suspect who had already attacked his own brother.  When he refused to submit to arrest, the officers preferenced nonlethal means of arrest over more dramatic and violent options.   No reasonable juror could find the use of pepperballs objectively unreasonable in violation of the Fourth Amendment.

We therefore affirm the district court's disposition of the claims against Sheriff Colbert.[1]

## B.  *The Oklahoma Tort Claim*

The district court also held that Clark's state tort claim was similarly infirm.  Clark argues the court erred in applying an exception to the Oklahoma Government Tort Claims Act.  But Clark's limited critique of the district court's analysis cannot support reversal on appeal.

The Oklahoma Government Tort Claims Act provides "the exclusive remedy for an injured plaintiff to recover against [an Oklahoma municipality] in tort." *Nail v. City of Henryetta*, 911 P.2d 914, 917 (Okla. 1996); *see* Okla. Stat. tit. 51, § 152.1.  The Oklahoma Supreme Court has defined a police officer's duty of care when making an arrest on behalf of a municipal government.  That duty, said the court, "is very specific: it is to use only such force in making an arrest as a *reasonably prudent* police officer would use in light of the *objective*

---

[1]  As a result of this disposition, we do not reach the additional arguments Clark has raised in support of his excessive force claims.  *See* Aplt. Br. at 33–46.

circumstances." *Morales v. City of Oklahoma City ex rel. Oklahoma City Police Department*, 230 P.3d 869, 880 (Okla. 2010) (emphases added) (bold omitted). And under Oklahoma law, the officer's *perspective* does not matter. *See id.* ("[A]n officer's subjective mistake of fact . . . is irrelevant."). Instead, the "objective facts" determine the reasonableness of police conduct. *Id.*

The district court found Clark's evidence of Oklahoma tort liability insufficient for multiple reasons. *First*, the claim failed the Oklahoma statute's discretionary function exception. *Second*, Clark could not hold the Wagoner County Board liable for the commands and actions of *another* municipality's police force that it did not control. *Finally*, said the district court, "the use of the pepperball gun . . . was objectively reasonable under the factual circumstances." App. 2750.

Clark's appeal leaves much of this analysis undisturbed. In fact, Clark only clearly asserts error with respect to the district court's discretionary-function analysis—his brief is silent as to the district court's other two independent bases for rejecting this claim. *See* Aplt. Br. at 32–33. And reading Clark's Fourth Amendment arguments to apply to the Oklahoma tort issue does not solve the problem; Clark still does not explain why, contrary to the district court's conclusion, we should allow him to hold the County Board responsible for the Broken Arrow officers' actions.

In light of this incomplete argument, we must affirm.  Our rules of appeal "require[] appellants to sufficiently raise all issues and arguments on which they desire appellate review in their opening brief." *Becker v. Kroll*, 494 F.3d 904, 929 n.6 (10th Cir. 2007) (citing Fed. R. App. P. 28(a)(9)(A)).  Accordingly, we will not question the reasoning of a district court unless an appellant "actually argue[s]" against it.  *Phillips v. Calhoun*, 956 F.2d 949, 954 (10th Cir. 1992); *see Harsco Corp. v. Renner*, 475 F.3d 1179, 1190 (10th Cir. 2007).  By offering an incomplete challenge to the district court's analysis, Clark has effectively abandoned his appeal of its ruling.  *Cf. Jackson v. Univ. of Pittsburgh*, 826 F.2d 230, 237 (3d Cir. 1987) (concluding an aspect of judgment was not actually appealed when it was not mentioned in opening brief).

For this reason, we cannot reverse the district court on Clark's Oklahoma tort claim.  To be clear, we neither endorse nor reject the district court's unchallenged conclusions.  We merely decline to reverse the district court on the basis of arguments Clark has not raised in this court.

### C.  The ADA Claim

Clark's challenge to summary judgment on his ADA claim fails for the same reason: Clark has not demonstrated error with respect to the district court's determination that the City of Broken Arrow is the only proper defendant for Clark's ADA claim.

-13-

Clark claims the Wagoner County Board violated the ADA by not properly training its police officers to handle mentally ill arrestees like himself. According to Clark, this failure-to-train predictably led the officers to forgo reasonable accommodation of Clark's mental illness while arresting him. As a result, Clark argues, he suffered "greater injury or indignity," during his arrest than other arrestees would have. *Gohier v. Enright*, 186 F.3d 1216, 1221 (10th Cir. 1999).

This theory of liability depends on several legal conclusions we have yet to actually embrace. To begin, we have never squarely held the ADA applies to arrests. *See J.H. ex rel. J.P. v. Bernalillo Cty.*, 806 F.3d 1255, 1260–61 (10th Cir. 2015); *cf. Gohier*, 186 F.3d at 1221 (noting, in dicta, that the arrest context is not categorically beyond the ADA's scope). Likewise, we have never held a municipality incurs liability under the ADA for failing to adequately train its employees. *See J.V. ex rel. C. v. Albuquerque Pub. Sch.*, 813 F.3d 1289, 1297 (10th Cir. 2016).[2] But we need not confront either of those open questions to resolve this appeal, as Clark has failed to rebut the district court's conclusion that the ADA does not transfer liability through the Broken Arrow officers to the Wagoner County Board in this case.

---

[2] It would be difficult for Clark to prove the necessary elements of a failure-to-train claim where, as here, the defendant municipality was not responsible for training the officers who committed the allegedly discriminatory acts. *Cf.* Aplt. Br. at 29.

The ADA mandates that "no qualified individual with a disability shall, by reason of such disability, . . . be subjected to discrimination by any [public] entity." 42 U.S.C. § 12132. To enforce this directive, Congress incorporated the remedies of the Civil Rights Act. *See id.* at § 12133. Accordingly, when a public entity discriminates on the basis of disability, the ADA provides a right of action to any victim of such discrimination. *See Barnes v. Gorman*, 536 U.S. 181, 185 (2002). But the Wagoner County Board clearly did not discriminate against Clark *directly*. Instead, if it discriminated against Clark at all, it did so through the actions of the Broken Arrow officers who formulated the arrest strategy and fired the pepperballs.

To be sure, federal regulations specify that the ADA's terms still apply when a municipality discriminates "through contractual, licensing, or other arrangements." 28 C.F.R. § 35.130(b)(1). Even still—as Clark himself recognizes, *see* Aplt. Br. at 16—an invocation of this provision requires proof that those who actually discriminated acted as *agents of* the defendant public entity. *See Mason v. Stallings*, 82 F.3d 1007, 1009 (11th Cir. 1996). Of course, there is no federal body of agency law readily applicable to ADA claims. To fill this intersticial gap in the regulation, we must therefore incorporate state law to the extent it does not frustrate the ADA's "specific objectives." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 98 (1991); *see United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 727–29 (1979).

Under Oklahoma law, "[a]n agency relationship generally exists if two parties agree that one is to act for the other." *Garrison v. Bechtel Corp.*, 889 P.2d 273, 283 (Okla. 1995). And of course, the principal must enjoy "some degree of control over the conduct and activities of the agent." *McGee v. Alexander*, 37 P.3d 800, 807 (Okla. 2001). Indeed, this "right to control" is "[t]he essential factor in any agency relationship." *Murray Cty. v. Homesales, Inc.*, 330 P.3d 519, 526–27 (Okla. 2014) (emphasis added). Crucially, though, the parties' conduct—*not their subjective beliefs*—establishes the bond between principal and agent. *See Farmers Nat'l Grain Corp. v. Young*, 102 P.2d 180, 185 (Okla. 1940); *see also Holmes v. McKey*, 383 P.2d 655, 665 (Okla. 1962) (explaining how an agency relationship can be expressly agreed to *or* implied through other conduct).

The district court identified Clark's only apparent evidence of an agency relationship: Sheriff Colbert giving Captain DuFriend "command of the operation," App. 2731, by telling Captain DuFriend to "[d]o what [he had] to do," Aplt. Br. at 7 (quoting App. 514); *cf.* App. 817 (disputing the fact that Captain DuFriend acted independently and not under Sheriff Colbert's supervision). Considered out of context, this fact and subsequent events may have been enough for Clark to survive summary judgment. And indeed, Captain DuFriend *believed* he was acting under Colbert's *authority*, if not formally as an agent of Wagoner County. The district court went on, however, to explain that—according to Oklahoma law governing police action—this hand-off was *not* consistent with an

-16-

agreement to allow the Broken Arrow police to act on behalf of the Wagoner County Board. *See* App. 2735, 2748–50 (discussing Okla. Stat. tit. 11, § 34-104(B) and Okla. Stat. tit. 21, § 99a).

As with the Oklahoma tort claim, Clark has not challenged this analysis on appeal. Instead, he merely asserts—without authority—that the "initiating agency . . . is the entity properly called to answer for the execution of [law enforcement] service." Aplt. Br. at 17. We have said many times that we need not consider broad assertions unaccompanied by authority or reference to the record. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998). Indeed, a party forfeits any issue so sparsely presented, as "[w]e need not . . . manufacture" arguments for the litigants before us. *Eateries, Inc. v. J.R. Simplot Co.*, 346 F.3d 1225, 1232 (10th Cir. 2003) (quoting *Sil–Flo, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1513 (10th Cir.1990)).

We therefore cannot disturb the district court's ruling on the ADA claim in the face of Clark's insubstantial challenge. *See, e.g.*, *LaFleur v. Teen Help*, 342 F.3d 1145, 1153 (10th Cir. 2003). Again, we reserve judgment on the district court's legal analysis. We hold only that Clark's briefing before us does not suffice to justify reversal.[3]

### D. The Medical Needs Claim

---

[3] Again, this disposition obviates the need to address Clark's other challenges to the district court's ADA ruling. *See* Aplt. Br. at 18–32.

Finally, Clark contends the district court erred in granting summary judgment on his medical needs claim against Nurse Practitioner Vicki Holland. We disagree.

The Eighth Amendment forbids government infliction of "cruel and unusual punishment[]." U.S. Const. amend. VIII. The federal courts have read this language to include an entitlement to a certain minimum standard of medical care while incarcerated. *See Estelle v. Gamble*, 429 U.S. 97, 101–05 & n.6 (1976). Of course, the Eighth Amendment itself "does not apply until after an adjudication of guilt." *Garcia v. Salt Lake Cty.*, 768 F.2d 303, 307 (10th Cir. 1985). Nevertheless, the Fourteenth Amendment guarantees pretrial detainees "the degree of protection against denial of medical attention which applies to convicted inmates." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) (quoting *Garcia*, 768 F.2d at 307). Accordingly, to prove liability against Holland, Clark must show "deliberate indifference to [his] serious medical needs." *Estelle*, 429 U.S. at 104.

That standard includes an objective component and a subjective component. *Martinez v. Garden*, 430 F.3d 1302, 1304 (10th Cir. 2005); *see generally Self v. Crum*, 439 F.3d 1227, 1230–33 (10th Cir. 2006) (discussing the standard in detail). The former turns on the seriousness of the need. "A medical need is [objectively] serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily

recognize the necessity for a doctor's attention." *Garden*, 430 F.3d at 1304

(quoting *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)).  As for the

subjective component, only "a prison official" who "knows of and disregards an

excessive risk to inmate health or safety" acts with deliberate indifference.  *Id.*

(quoting *Sealock*, 218 F.3d at 1209).

Clark's medical needs claim arises from the treatment he received while in

Wagoner County's custody.  Eleven days after his arrest, Clark recovered enough

from his injuries to be admitted into the Wagoner County Jail.  Throughout his

detention at the jail, Nurse Practitioner Vicki Holland[4] oversaw Clark's long-term

recovery process, treating him a total of ten times over roughly eleven months.

Given the undisputed facts as detailed below, no reasonable juror could find

Holland's treatment violated Clark's constitutional rights.

After Holland's first examination, she made note of Clark's injuries.  Some

of the gunshot wounds "were seeping," but there was "no active bleeding" nor

any "signs or symptoms of infection."  App. 86.  She thus instructed jail and

medical staff to bathe Clark daily, "wash the [gunshot] wounds with soap and

water[,] and place dry dressings over the two wounds which were still draining."

---

[4] Nurse Holland is an Advanced Practice Registered Nurse-Certified Nurse Practitioner.  This means she "performs in an expanded role in the delivery of health care" beyond that of a Registered Nurse due to advanced educational achievement, knowledge, and specialization. Okla. Stat. tit. 59, § 567.3a(6).  She is a primary care provider with a national certification in family medicine.

*Id.* Holland also prescribed a daily dose of Aspirin "to suppress blood clot presentations[,] and ordered [Clark] to continue all other medications prescribed from the hospital." *Id.*

Holland then saw Clark four more times over the next month. Her second visit occurred less than a week after the first. At that time, she noted "[t]he [gunshot] wounds on [Clark's] back and abdomen were all healing well with minimal clear drainage." App. 87. But "the incision on [Clark's] right femur was red and warm to the touch and had [begun] draining with a foul odor." *Id.* Holland therefore placed Clark on a week-long course of two medications. Daily baths and dressing changes were to continue as well.

A week later, Holland observed Clark's surgical incision, though "still draining," "had less redness and appeared to be much better." *Id.* She thus required Clark to continue his treatment for another week. When Holland returned the next week, Clark "reported that he was feeling good, but that his right leg was stiff." *Id.* Holland "removed the staples on the upper portion of [Clark's] surgical incision," but not "from the incision around the knee due to some continuing redness and drainage." *Id.* Holland ordered Clark to continue taking antibiotics for another week, and continue dry dressing his wounds with daily bandage changes. A week after that, Holland "removed all the remaining staples on [Clark's] surgical incision on his right knee." *Id.* She noted "less redness on the knee, but . . . a large amount of thick white substance." *Id.*

Nevertheless, "[a]ll other wounds were healing well." *Id.* Clark was then "moved out of the lock-up observation cell," and the frequency of check-ups thereafter reduced. *Id.*

Holland next examined Clark about a month later. At that time, Clark "was complaining of right knee swelling due to an increase in his activities." App. 88. Holland did not prescribe any additional treatment. Two weeks later, Clark "complained of swelling in his right knee with no increase in pain." *Id.* Holland "ordered [Clark] be provided with a warm pack for his knee twice daily." *Id.* Suspecting, on account of his pale skin color, that Clark was also suffering from anemia, Holland ordered Clark to stop taking Ibuprofen and instead "started him on daily B12 and iron supplements." *Id.*

Thereafter, Holland saw Clark sporadically to address several conditions not obviously related to his gunshot wounds. These included a possible hernia on his left side, "a bulge in the center of his abdomen," and an abscess under his arm. *Id.* At one of these meetings, months after coming to jail and months before his release, Clark "indicated he was feeling ok." *Id.* With regard to his gunshot and surgical wounds, Holland noted only that Clark had "a soft hernia on one of his incisions," and his "color had improved," though not entirely. *Id.* She at one point ordered "an additional supplement of B12." *Id.* These were the last documented interactions between Clark and Holland, and at no point before or

after Holland's treatment did Clark "file any requests to staff or grievances regarding his medical care." App. 89.

Upon his release, however, Clark followed up with Dr. Dumais—the surgeon who originally operated on his leg. Dr. Dumais identified a failure in Clark's "distal fixation." App. 1820. Clark's briefing does not explain this diagnosis, but we gather it means the metal plate and screws installed above his right knee to help heal his shattered femur had somehow bent or shifted. Though the severed bone had reunified, the portion just above the knee was now somewhat misaligned.

These facts do not support a medical needs claim.

To begin, Holland's treatment of the gunshot and surgical wounds themselves cannot further Clark's case for liability. On the contrary, Holland oversaw the gradual healing of all three wounds. And Clark does not argue the infection of his leg supports the claim. *See* Aplt. Br. at 46–55. Nor could he, because at no point could a reasonable juror conclude it posed an "obvious" and "excessive risk to [his] health or safety." *Sealock*, 218 F.3d at 1209. And though Clark says his injuries required physical therapy, *see* Aplt. Br. at 52–53, Clark offers no evidence of such a diagnosis, nor would a reasonable juror conclude the need was *obvious* based on Clark's wounds and hospital discharge instructions. More importantly, Clark does not rebut the district court's conclusion that his

-22-

complaint never alleged a deprivation of physical therapy as a basis for the medical needs claim. *See* App. 2527.

Clark thus stakes his entire claim on Holland's failure to deliver him to Dr. Dumais for a follow-up appointment consistent with Clark's discharge instructions. *See* Aplt. Br. at 51–52. But so-called "gatekeeper liability," Aplt Br. at 51, will not lie here. A reasonable juror *might* conclude Holland knew of but declined to follow the instructions. *See* App. 2459, 2480–81. But a gatekeeper "claim is . . . actionable *only* in cases where the need for additional treatment or referral to a medical specialist is *obvious*." *Self*, 439 F.3d at 1232 (emphasis added). The instruction to follow up with Dr. Dumais does not amount to a diagnosis of a particular condition or a prescription of specific care. And Clark never requested to see Dr. Dumais, nor did he present symptoms obviously beyond Holland's ken. *Cf. Mata v. Saiz*, 427 F.3d 745, 750, 756 (10th Cir. 2005) (evidence that a practical nurse *ignored* an inmate's severe chest pain sufficed to prevent summary judgment). Moreover, even if Holland's conduct was at a certain point "unreasonable," App. 2636, a failure to exercise reasonable professional judgment does not a constitutional violation make. *Estelle*, 429 U.S. at 106. Clark must instead prove Holland's decision to treat Clark herself rather than release him to Dr. Dumais was in conscious "disregard[] [of] an *excessive risk* to [his] health or safety." *Garden*, 430 F.3d at 1304 (emphasis added)

(quoting *Sealock*, 218 F.3d at 1209). His proffered evidence simply does not suffice to make that showing.

In short, neither the objective nor subjective requirements of a medical needs claim can be met on these facts. Nonetheless, Clark contends the Supreme Court's decision in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), "held open the possibility that an objective-only standard should apply to" his medical needs claim. Aplt. Br. at 46; *see id.* at 49. Yet he does not argue that *Kingsley* actually displaced any precedent regarding medical care during pretrial detention. We thus have no occasion to revisit the applicable law. *See In re Smith*, 10 F.3d 723, 724 (10th Cir. 1993) (per curiam).

## III. Conclusion

For the foregoing reasons, we **AFFIRM** the district court on all issues.