BACHARACH, J., concurring in part and dissenting in part.
Officer William Husk responded to a 911 report that Mr. Jaime Ceballos was armed and creating a disturbance in a residential neighborhood. Officer Husk's response led to a confrontation in which he fatally shot Mr. Ceballos. Mr. Ceballos's estate and family sued, bringing four claims:
1. a claim against Officer Husk under 42 U.S.C. § 1983, alleging excessive *1224 force in violation of the Fourteenth Amendment,
2. a § 1983 claim against the City of Thornton for failing to adequately train Officer Husk,
3. a claim against the City for violating the Americans with Disabilities Act, and
4. a state-law claim against Officer Husk for wrongful death.
Officer Husk and the City of Thornton moved for summary judgment. The district court granted summary judgment to the City on the claim under the Americans with Disabilities Act; in all other respects, the district court denied the motion for summary judgment, leading Officer Husk and the City to appeal.
I agree with the majority that we lack jurisdiction over (1) the City's appeal on the failure-to-train claim and (2) Officer Husk's appeal on the wrongful-death claim. But I respectfully disagree with the majority's discussion in Part II(A), which upholds the denial of summary judgment to Officer Husk on the § 1983 claim of excessive force. In my view, Officer Husk enjoys qualified immunity because the constitutionality of his conduct fell within the realm of reasonable debate. So I would reverse the district court's denial of Officer Husk's motion for summary judgment on the claim under § 1983.
I. The Standards for Qualified Immunity and Excessive Force
We engage in de novo review of the denial of summary judgment based on qualified immunity. Henderson v. Glanz , 813 F.3d 938, 951 (10th Cir. 2015). In conducting this review, we consider the district court's factual findings and reasonable assumptions drawn from the summary judgment evidence. Cox v. Glanz , 800 F.3d 1231, 1242 (10th Cir. 2015). Based on this universe of factual findings and reasonable assumptions, the plaintiffs bore the burden to defeat Officer Husk's defense of qualified immunity. Id. at 1245. We thus consider whether the plaintiffs showed
• that Officer Husk had violated a constitutional right and
• that this right had been clearly established.
Apodaca v. Raemisch , 864 F.3d 1071, 1076 (10th Cir. 2017).
The majority concludes that the plaintiffs' evidence created a triable fact issue on the existence of a constitutional violation. Here the alleged constitutional violation involves the Fourth Amendment. For a Fourth Amendment claim of excessive force, we consider the totality of circumstances from the perspective of a reasonable officer on the scene. Estate of Larsen ex rel. Sturdivan v. Murr , 511 F.3d 1255, 1260 (10th Cir. 2008).
These circumstances include whether Officer Husk recklessly or intentionally created the need to use force. See Medina v. Cram , 252 F.3d 1124, 1132 (10th Cir. 2001) (observing that an officer's conduct prior to the creation of a threat bears on the reasonableness of the force). We also consider four other non-exclusive factors bearing on the immediacy and severity of the danger to Officer Husk when he approached Mr. Ceballos:
1. whether Officer Husk ordered Mr. Ceballos to drop his weapon and whether Mr. Ceballos complied,
2. whether Mr. Ceballos made any hostile motions toward the officers,
3. the distance between Officer Husk and Mr. Ceballos, and
4. the manifest intentions of Mr. Ceballos.
See Estate of Larsen , 511 F.3d at 1260.
When assessing the totality of circumstances, we must consider the sequence of events. The use of force may be unreasonable even in the face of an immediate, severe danger if the officer had recklessly *1225 created the danger. See Allen v. Muskogee , 119 F.3d 837, 839-41 (10th Cir. 1997) (concluding that an officer's use of deadly force against a suspect, who was pointing a gun at the officer, may have been excessive if the officer had recklessly or intentionally created the danger). The reverse is also true: even if an officer does not recklessly or intentionally create the need for deadly force, it may still be excessive if the officer faced no immediate danger. See Fancher v. Barrientos , 723 F.3d 1191, 1200-01 (10th Cir. 2013) (concluding that an officer's use of deadly force against a suspect, who had created a dangerous situation, was not reasonable after the danger had passed). So we should consider the reasonableness of Officer Husk's conduct in two discrete time-periods:
1. the time leading to his confrontation with Mr. Ceballos and
2. the time of the actual confrontation.
Let's assume, for the sake of argument, that Officer Husk violated the Fourth Amendment. He would still enjoy qualified immunity unless he had violated a clearly established constitutional right. See p. 1224, above. A constitutional right is clearly established when a Tenth Circuit or Supreme Court precedent is on point, making the unlawfulness of the conduct apparent. Apodaca v. Raemisch , 864 F.3d 1071, 1076 (10th Cir. 2017). In deciding whether a precedent is on point, we cannot define the right at a " 'high level of generality.' " White v. Pauly , --- U.S. ----, 137 S.Ct. 548, 552, 196 L.Ed.2d 463 (2017) (per curiam) (quoting Ashcroft v. al-Kidd , 563 U.S. 731, 742, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011) ). Instead, the precedent must be particularized to the facts. Id.
A precedent can be particularized to the facts in one of two ways. First, the precedent may involve a determination that materially similar conduct is unlawful. Apodaca , 864 F.3d at 1076. Second, a general precedent may be considered specific enough "when the defendant's conduct 'obviously' violates the law." Id. (quoting White , 137 S.Ct. at 552 ). "Thus, a right is clearly established when a precedent involves 'materially similar conduct' or applies with 'obvious clarity' to the conduct at issue." Apodaca , 864 F.3d at 1076 (emphasis removed) (quoting Estate of Reat v. Rodriguez , 824 F.3d 960, 964-65 (10th Cir. 2016) ).
By confining our analysis to precedents involving materially similar conduct or applying with obvious applicability, we ensure that officers receive fair notice about the conduct deemed unconstitutional. Brosseau v. Haugen , 543 U.S. 194, 198-99, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (per curiam). Given the need for fair notice, police officers enjoy qualified immunity absent a precedent that " 'squarely governs' the specific facts at issue." Kisela v. Hughes , --- U.S. ----, 138 S.Ct. 1148, 1153, 200 L.Ed.2d 449 (2018) (per curiam) (quoting Mullenix v. Luna , --- U.S. ----, 136 S.Ct. 305, 309, 193 L.Ed.2d 255 (2015) (per curiam)).
"[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." Mullenix , 136 S.Ct. at 308 (internal quotation marks omitted). Given the need for specificity, police officers would incur personal liability only when the underlying constitutional violation has been established " 'beyond debate.' " Apodaca , 864 F.3d at 1076 (quoting White , 137 S.Ct. at 551 ). Put another way, police officers enjoy qualified immunity unless they showed plain incompetence or knowingly violated the law. Malley v. Briggs , 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).
We consider this standard against the Fourth Amendment test for claims of excessive *1226 force. Analysis of excessive-force claims is inherently fact-intensive, turning on a balance of factors rather than bright-line rules. Graham v. Connor , 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) ; see Estate of Larsen ex rel. Sturdivan v. Murr , 511 F.3d 1255, 1262 (10th Cir. 2008) (stating that bright-line rules do not exist for deciding whether the use of deadly force was objectively reasonable); see also Fisher v. City of Las Cruces , 584 F.3d 888, 894 (10th Cir. 2009) ("[T]he Fourth Amendment's reasonableness inquiry notoriously eludes easy formula or bright line rules."). The balancing of factors often creates uncertainty for police officers over the lawfulness of their conduct. See Cavanaugh v. Woods Cross City , 625 F.3d 661, 666 (10th Cir. 2010) (stating that for qualified immunity, "[o]n-point cases are particularly important when the constitutional question involves a balancing test"); see also Columbian Fin. Corp. v. Stork , 811 F.3d 390, 402 (10th Cir. 2016) (holding that state regulators' conduct did not violate a clearly established constitutional right because the underlying test involved balancing multiple factors and the defendants faced "inherent uncertainty in how our court or the Supreme Court would apply the fact-intensive balancing test"); accord Foy v. Holston , 94 F.3d 1528, 1535 n.8 (11th Cir. 1996).[1] Navigating the uncertainty of a balancing test becomes even more difficult when police officers must act quickly. See Marquez v. Albuquerque , 399 F.3d 1216, 1220 (10th Cir. 2005).
II. Creation of the Danger
Officer Husk had to act quickly once he confronted Mr. Ceballos, who was yelling and wildly swinging a baseball bat. But the plaintiffs contend that Officer Husk created the danger by needlessly confronting Mr. Ceballos. Had Officer Husk recklessly or intentionally created the danger, his later use of deadly force may have been unreasonable. See Medina v. Cram , 252 F.3d 1124, 1132 (10th Cir. 2001). We thus consider Officer Husk's actions leading to the confrontation with Mr. Ceballos.
A police dispatcher issued a high-priority request for service, reporting that Mr. Ceballos was a "[drunk], unwanted party" in a residential neighborhood and was carrying one or more baseball bats. Officer Husk responded, along with a second officer (Officer Eric Ward). When the officers arrived at the scene, they spotted
• Mr. Ceballos's wife and infant daughter and
• two friends of Mr. Ceballos.
For the sake of argument, we may assume that Officer Husk prematurely confronted Mr. Ceballos. Rather than stop and ask questions, Officer Husk passed Mr. Ceballos's wife and friends and approached Mr. Ceballos. When about 100 yards away, Officer Husk saw Mr. Ceballos swinging a baseball bat, pacing, yelling, and throwing his arms in the air.
Officers Husk and Ward continued to approach Mr. Ceballos and ordered him to drop the bat. Mr. Ceballos refused. Instead of dropping the bat, Mr. Ceballos entered his garage, where he was shielded from the officers' view. Officer Husk pulled out a gun and continued to advance without waiting for a third officer to retrieve a *1227 less-lethal weapon. Mr. Ceballos emerged from the garage with the bat and walked toward the officers.
The officers continued ordering Mr. Ceballos to drop the bat. Mr. Ceballos refused and spewed expletives, like "Fuck you!" and "Or what, Motherfucker?" Officer Husk warned that he would shoot if Mr. Ceballos did not comply. The men continued to approach each other until they were 12-to-20 feet apart.[2] Officer Husk then shot Mr. Ceballos.
For the sake of argument, we can assume that Officer Husk recklessly or intentionally created the need to use deadly force. Even with this assumption, Officer Husk would enjoy qualified immunity for his conduct leading to the use of force unless his conduct violated a clearly established constitutional right.
The plaintiffs rely on three opinions to show that Officer Husk violated a clearly established constitutional right: Hastings v. Barnes , 252 F. App'x 197 (10th Cir. 2007) (unpublished), Sevier v. City of Lawrence , 60 F.3d 695 (10th Cir. 1995), and Allen v. Muskogee, Okla. , 119 F.3d 837 (10th Cir. 1997). The plaintiffs' reliance on Hastings and Sevier is misguided. Hastings does not constitute precedent and "provide[s] little support for the notion that the law is clearly established." Knopf v. Williams , 884 F.3d 939, 947 (10th Cir. 2018) (quoting Mecham v. Frazier , 500 F.3d 1200, 1206 (10th Cir. 2007) ); see also Estate of Bleck v. Alamosa , 643 F. App'x 754, 757 (10th Cir. 2016) (unpublished) (upholding summary judgment for police officers in part because Hastings was unpublished and distinguishable). And in Sevier , we held only that our court lacked jurisdiction; we did not clearly establish any right. 60 F.3d at 700-01.
Nor did Allen clearly establish a constitutional violation from Officer Husk's conduct. In Allen , the police responded to a report that a man had threatened his family members, was contemplating suicide, and was sitting outside with a gun. 119 F.3d at 839. When police officers arrived, they saw the suspect sitting in a car with a gun in his hand, resting on the console. Id . According to the plaintiffs' evidence, the officers ran to the car, screaming and reaching into the window to pry the gun out of the suspect's hand. Id. at 841. In the ensuing struggle, the suspect pointed his gun at the officers, who then shot the suspect. Id. at 839. We concluded that a reasonable jury could have found a violation of the Fourth Amendment. Id. at 841.
Although some similarities exist between Allen and our case, the conduct in the two cases was substantially different. As in Allen , the officer here was called to respond to a report of a disturbed man with a weapon outside a home. Unlike the suspect in Allen , however, Mr. Ceballos was mobile and over 100 yards away from the officers, presenting an opportunity to flee or enter another home in the neighborhood. And when Mr. Ceballos entered the garage, disappearing from view, the officers might reasonably have thought that he was retrieving a gun or other weapon.[3] These possibilities were absent in Allen .
*1228 As Mr. Ceballos's disturbance continued, it diverged further from the situation discussed in Allen . There the suspect was sitting in a car and made no threatening gestures until the officers initiated physical contact. See p. 1227, above. Here, however, it was Mr. Ceballos who initiated the showdown with police officers. After swinging a baseball bat, he walked directly toward the officers, disobeying commands and openly challenging the officers with his bat in hand.
Perhaps if Allen were read broadly, the factual differences between Allen and our case could be considered immaterial. But a competent officer, making a split-second decision about how to respond to a suspect, could reasonably have interpreted Allen more narrowly and viewed the factual differences as material. See Kisela v. Hughes , --- U.S. ----, 138 S.Ct. 1148, 1152-54, 200 L.Ed.2d 449 (2018) (per curiam) (discussing the importance, for qualified immunity, of the need for police officers to make split-second decisions about a suspect's threat to others).
A narrow interpretation of Allen is supported by our opinions in Thomson v. Salt Lake County , 584 F.3d 1304 (10th Cir. 2009), and Clark v. Colbert , 895 F.3d 1258 (10th Cir. 2018).[4] In Thomson , the police received a night-time report that a man had threatened a woman with a rifle, was likely armed and potentially suicidal, and was loose in a residential neighborhood. 584 F.3d at 1310. The officers searched the neighborhood and released a police dog to assist. Id. Once the suspect was located, the officers surrounded him and ordered him to drop his rifle. Id. But instead of dropping the rifle, the suspect pointed it at the officers. Id. at 1311. The officers shot him while he was holding his rifle upward, near and toward his own head. Id. We concluded that the officers' conduct did not violate the Fourth Amendment. Id. at 1322.
In Clark , a man called the police because his mentally ill brother was suffering an episode and wielding a knife. 895 F.3d at 1261. The responding officers found the suspect standing on the porch of his home, visibly irritated and holding a knife. Id. at 1262. Rather than submit to arrest, the suspect kept his knife and made threatening gestures toward the officers. Id. At no point did the suspect attempt to leave the porch or get within striking distance of the officers. Id .
The officers requested assistance from another police department. Once all the officers arrived, they formed a plan and carried it out. Id. Rather than observe the suspect from a distance and let him calm down, the officers confronted him by firing a chemical irritant. Id. But the chemical irritant provoked the suspect, and he charged the officers with the knife in hand. Id. The officers then tried tasing; when these efforts failed, they shot him several times. Id. at 1263. The suspect argued that using any more force was unreasonable because he had already been "contained" and posed no immediate threat to anyone.
*1229 Id. We disagreed, concluding that the officers' decision to deploy the irritant did not violate the Fourth Amendment. Id. at 1262-64.[5]
Thomson and Clark bear some substantial similarities to our case. The Thomson suspect was in a residential neighborhood; Mr. Ceballos was, too. He had not strayed beyond his driveway, but who knew what he would do next? Only moments earlier, he had been swinging his baseball bat while threatening the police. Even after leaving the garage, he refused to drop the bat as he approached the officers. Officer Husk could reasonably fear that Mr. Ceballos could strike at any moment or endanger neighbors who happened to walk by or to come outside.
Likewise, Clark bears similarities to our case. There the suspect had stayed on his porch (see p. 1228, above); and here, Mr. Ceballos had not left his property. Thus, the officers in both Clark and our case might have avoided the use of any force by declining to engage the suspect.
At the same time, however, both Thomson and Clark bear some differences with our case. The differences with Thomson include the weapon: Mr. Ceballos had a baseball bat, and the Thomson suspect had a gun. Both the baseball bat and gun could inflict deadly force, but the gun could be used from a greater distance. In Thomson the officers also needed to find the suspect, and Officer Husk was able to keep Mr. Ceballos within sight except for his brief trip to the garage.
Clark also bears some differences with our case. For example, Officer Husk arguably acted less cautiously than the officers in Clark , who gathered backup and formed a plan of engagement before escalating the use of force. See p. 1228, above.
Allen , Thomson , and Clark share some similarities and dissimilarities to the situation confronting Officer Husk. On the one hand, a reasonable officer could view Mr. Ceballos's behavior as akin to the behavior of the Allen suspect, seated in his car. On the other hand, a reasonable officer could liken Officer Husk to the officers who had confronted the suspect in Thomson . This perspective would find support in our subsequent analysis in Clark .
Allen suggested that Officer Husk might be acting recklessly by entering the driveway, and Thomson and Clark suggested that Officer Husk could lawfully approach Mr. Ceballos. The underlying issue is how broadly or narrowly an officer should have interpreted Allen in light of guidance from our other opinions. Some officers might read Allen broadly based on the court's reasoning; others might read Allen more narrowly based on its underlying facts.
We addressed a similar situation in Apodaca v. Raemisch , 864 F.3d 1071 (10th Cir. 2017). There qualified immunity turned on how an officer should read one of our prior opinions ( Perkins v. Kansas Department of Corrections , 165 F.3d 803 (10th Cir. 1999) ). Apodaca , 864 F.3d at 1074, 1078-79. We concluded that the availability of differing interpretations was enough to trigger qualified immunity:
Which reading of Perkins is correct? For now, it is enough to conclude that the question is within the realm of reasonable debate, for Perkins can be read either expansively or narrowly.
The availability of conflicting interpretations is unsurprising in light of our competing principles guiding interpretations like Perkins . On the one hand, the language of a judicial decision must be interpreted with reference to the circumstances *1230 of the particular case and the question under consideration....
But on the other hand, the discovery of what facts are material in any decision is by no means easy. Generally, we ascertain the materiality of individual facts based on which ones are emphasized in a given opinion.
Id. at 1078-79 (internal quotation marks and citations omitted).
As in Apodaca , the governing precedent ( Allen ) can be read broadly or narrowly. We have distinguished Allen four times in cases upholding qualified immunity after police shootings. See Pauly v. White , 874 F.3d 1197, 1223 (10th Cir. 2017) (stating that Allen "is of little help" on qualified immunity "because the facts are completely different"); Medina v. Cram , 252 F.3d 1124, 1132-33 (10th Cir. 2001) (distinguishing Allen because that case turned on a material dispute regarding eyewitness testimony and turned on "the typical summary judgment standard" rather than the plaintiff's stricter burden to justify qualified immunity); Estate of Bleck v. Alamosa , 643 F. App'x 754, 756-57 (10th Cir. 2016) (unpublished) (upholding summary judgment for police officers in part because Allen was distinguishable when the suspect was "volatile, intoxicated, and possibly armed"); Estate of Ronquillo v. City & Cty. of Denver , 720 F. App'x 434, 441 (10th Cir. 2017) (unpublished) (distinguishing Allen based in part on differences involving the reasonableness of the police conduct). We also distinguished Allen in a fifth opinion upholding qualified immunity. Lord v. Hall , 520 F. App'x 687, 693 (10th Cir. 2013) (unpublished). Though this case did not involve a police shooting, it did involve a claim of excessive force. There too we relied on the plaintiff's burden to overcome qualified immunity (a burden absent in Allen ) and the absence of a material factual dispute over the officers' conduct prior to the use of force. Id. Given these five opinions and similar factual distinctions between our own case and Allen , Officer Husk's use of force did not reflect plain incompetence or a knowing violation of the law. See pp. 1225-26, above. So his decision to confront Mr. Ceballos did not violate a clearly established constitutional right.
III. The Use of Deadly Force
The plaintiffs have not identified an opinion recognizing a Fourth Amendment violation for the use of deadly force in similar circumstances.[6] But our precedent might have clearly established a constitutional violation if the use of force had obviously been excessive. See p. 1225, above. We should thus consider the four factors bearing on the immediacy and severity of the danger to Officer Husk when he confronted Mr. Ceballos. See Estate of Larsen ex rel. Sturdivan v. Murr , 511 F.3d 1255, 1260 (10th Cir. 2008) ; see also p. 1224, above. In considering these factors, we must consider the district court's factual findings and reasonable assumptions drawn from the summary judgment evidence. See p. 1224, above.
Whether Officer Husk ordered Mr. Ceballos to drop his weapon and whether Mr. Ceballos complied . The first factor supports Officer Husk. He shouted multiple orders for Mr. Ceballos to drop the baseball bat; Mr. Ceballos heard these *1231 commands and responded, but he refused to comply.
Whether any hostile motions were made toward Officer Husk . This factor is less clear-cut. The district court did not find that Mr. Ceballos was swinging the baseball bat as he approached the officers. In isolation, this fact might undercut the need for deadly force.
But a reasonable officer could perceive an immediate threat when Mr. Ceballos ignored multiple commands to drop the bat, challenged the officers, and continued toward the officers. See Estate of Larsen ex rel. Sturdivan v. Murr , 511 F.3d 1255, 1263 (10th Cir. 2008) (stating that disregard of police commands and walking toward officers, while wielding a weapon, constituted hostile actions). Even if Mr. Ceballos had stopped swinging the baseball bat, Officer Husk could reasonably perceive a continued threat to his safety. If this factor points either way, it would support Officer Husk.
The distance separating Officer Husk and Mr. Ceballos. The third factor calls for an examination of the distance separating the officers from the suspect. We have declined to adopt a bright-line rule requiring that the suspect be within striking distance before an officer may use force. Id. at 1262. Mr. Ceballos was between 12 and 20 feet from Officer Husk when the gun was fired. We have regarded similar distances as sufficient to create an immediate threat to officers. See id. (finding that an officer's use of deadly force was reasonable when a suspect armed with a knife was between 7 and 20 feet away).
It is true that Mr. Ceballos was carrying a baseball bat rather than a gun. And a gun can injure or kill from further away than a baseball bat. Cf. Perez v. Suszczynski , 809 F.3d 1213, 1220 (11th Cir. 2016) ("[A] person standing six feet away from an officer with a knife may present a different threat than a person six feet away with a gun."). Even under the district court's factual findings and reasonable assumptions, however, Officer Husk couldn't have known whether Mr. Ceballos was within seconds of landing a blow with his baseball bat.
The parties disagree on how quickly Mr. Ceballos was moving. But all parties recognize that Mr. Ceballos was closing the distance between himself and Officer Husk, shortening the window of time before Officer Husk would be within striking distance of the baseball bat. Our precedent did not require Officer Husk to wait until he was within reach of the baseball bat. See Estate of Larsen , 511 F.3d at 1260 ("A reasonable officer need not await the 'glint of steel' before taking self-protective action; by then it is 'often ... too late to take safety precautions.' " (quoting People v. Morales , 198 A.D.2d 129, 603 N.Y.S.2d 319, 320 (1993) )). The third factor thus supports Officer Husk.
The manifest intentions of Mr. Ceballos . The final factor also supports Officer Husk. Mr. Ceballos was approaching the officers with a baseball bat and shouting threats. This conduct suggested an intent to harm the officers.
The totality of circumstances . Under the four factors, a reasonable officer may not have regarded deadly force as an obvious violation of the Fourth Amendment. Even under the district court's factual findings and reasonable assumptions, the four factors could provide reasonable support for Officer Husk's decision to shoot. See Apodaca v. Raemisch , 864 F.3d 1071, 1076 (10th Cir. 2017). Because the factors do not establish a Fourth Amendment violation with obvious clarity, any potential constitutional violation would not have been clearly established.
The Supreme Court addressed similar facts in Kisela v. Hughes , --- U.S. ----, 138 S.Ct. 1148, 200 L.Ed.2d 449 (2018) (per *1232 curiam). There a police officer shot a suspect who had reportedly acted erratically and was carrying a kitchen knife about six feet away from her roommate amid a heated disagreement. Kisela , 138 S.Ct. at 1150-51. The Supreme Court held that the police officer was entitled to qualified immunity. Id. at 1152. The Court explained:
[The police officer] had mere seconds to assess the potential danger to [the roommate]. He was confronted with a woman who had just been seen hacking a tree with a large kitchen knife and whose behavior was erratic enough to cause a concerned bystander to call 911 and then flag down [two police officers]. [The police officer who ultimately fired the gun] was separated from [the suspect and roommate] by a chain-link fence; [the suspect] had moved to within a few feet of [the roommate]; and she failed to acknowledge at least two commands to drop the knife. Those commands were loud enough that [the roommate], who was standing next to [the suspect], heard them. This is far from an obvious case in which any competent officer would have known that shooting [the suspect] to protect [the roommate] would violate the Fourth Amendment.
Id. at 1153.[7]
Here, as in Kisela , the police officer had only seconds to assess the risk. In Kisela , as here, the suspect had a weapon other than a gun. And in both cases, the suspects ignored police commands to drop the weapon. These circumstances led the Supreme Court in Kisela to conclude that a reasonable police officer could have perceived an immediate threat. Id. at 1153-54. The same is true here. See Meyers v. Baltimore Cty. , 713 F.3d 723, 732-33 (4th Cir. 2013) (holding that an officer was justified in shooting a suspect with a taser three times when the suspect was holding a baseball bat and advancing toward the officers, posing an immediate threat to the officers' safety); see also Smith v. Mattox , 127 F.3d 1416, 1419 (11th Cir. 1997) (per curiam) ("[A]fter facing [the suspect] with an upraised baseball bat, [the officer] could reasonably have supposed that [the suspect] presented some sort of danger to others' safety.").
IV. Conclusion
We should reverse the district court's denial of summary judgment to Officer Husk on the issue of qualified immunity. The district court erroneously concluded that Officer Husk's conduct violated a clearly established constitutional right. Because the majority upholds this ruling, I respectfully dissent from Part II(A) of the majority opinion.

In Foy , the court said:
When the law contemplates some kind of balancing test to determine the ultimate question of lawfulness or unlawfulness of an act, qualified immunity almost always applies to shield the public servant defendant: the lack of bright lines associated with balancing tests prevents the preexisting law, given the circumstances of a specific case, from having been clearly established when the public servant took the step that resulted in his later being a defendant in a lawsuit.
94 F.3d at 1535 n.8.

The district court did not make a finding of fact regarding the distance between Officer Husk and Mr. Ceballos when the gun was fired. The court noted that Officers Husk and Ward had testified that the distance was no more than 20 feet and a minimum of 12 to 15 feet. The plaintiffs have conceded that Officer Husk was about 20 feet away from Mr. Ceballos when the gun was fired. I thus assume the two men were between 12 and 20 feet apart.

Mr. Ceballos never did try to flee, to enter another home, or to retrieve a weapon from the garage. But we analyze whether the use of force was reasonable "from the perspective of a reasonable officer on the scene." Estate of Larsen ex rel. Sturdivan v. Murr , 511 F.3d 1255, 1259 (10th Cir. 2008). And a reasonable officer had no way of knowing whether Mr. Ceballos had retrieved another weapon from the garage or was going to endanger others in the neighborhood. See Fisher v. City of San Jose , 558 F.3d 1069, 1084 (9th Cir. 2009) (en banc) ("The law recognizes that officers on the scene cannot predict future events with the clarity which we, as judges, can review the past."). Even viewed charitably, Mr. Ceballos's behavior appeared erratic, dangerous, and unpredictable.

We assess qualified immunity "in light of the legal rules that were 'clearly established' at the time [the action] was taken." Wilson v. Layne , 526 U.S. 603, 614, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). Clark was issued after Officer Husk had shot Mr. Ceballos. But we may "examine cases published after [an action was taken] to the extent they shed light on the fact that the law was not clearly established at the relevant time." Herrera v. City of Albuquerque , 589 F.3d 1064, 1071 (10th Cir. 2009) (quoting Swanson v. Town of Mountain View , 577 F.3d 1196, 1200 (10th Cir. 2009) ).

In Clark , we distinguished Allen based on factual differences in what the officers had done in the runup to the confrontation. Clark , 895 F.3d at 1264.

As the majority notes, the plaintiffs did not argue on appeal that Officer Husk's conduct would have been obviously unconstitutional even in the absence of a precedent involving materially similar conduct. See Medina v. Cram , 252 F.3d 1124, 1128 (10th Cir. 2001) (once qualified immunity has been invoked, the burden shifts to the plaintiff to establish that a clearly established right was violated). But Officer Husk did argue that our general precedents had not established the illegality of his conduct with obvious clarity. Given Officer Husk's appellate argument, I have addressed it.

Kisela was decided after Officer Husk had shot Mr. Ceballos. But we can consider Kisela as evidence that the law had not been clearly established when Officer Husk acted. See note 4, above.