**PUBLISH**
**FOR THE TENTH CIRCUIT**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 26, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

ESTATE OF JAIME CEBALLOS;
QUIANNA VIGIL; NAVEYAH
CEBALLOS, through next friend;
JAYDEN CEBALLOS, through next
friend,

     Plaintiffs - Appellees,

v.

WILLIAM HUSK, individually; CITY OF
THORNTON,

     Defendants - Appellants.

No. 17-1216

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:15-CV-01783-RPM)**
_____

Courtney B. Kramer (Eric M. Ziporin with her on briefs) Senter Goldfarb & Rice, LLC,
Denver, Colorado, for Defendants-Appellants.

Erica T. Grossman (Anna Holland Edwards with her on the brief) Holland, Holland
Edwards & Grossman, P.C., Denver, Colorado, for Plaintiffs-Appellees.
_____

Before **BACHARACH**, **EBEL**, and **MORITZ**, Circuit Judges.
_____

**EBEL**, Circuit Judge.
_____

Jaime Ceballos's wife, Quianna Vigil, called police on an August evening in 2013 to report that her husband was in their driveway with a baseball bat "acting crazy," and that he was drunk and probably on drugs. Vigil further reported that she was afraid and had left the house with their seventeen-month-old; Vigil wanted police to remove Ceballos so she could return home to put the child to bed. Defendant William Husk and several other Thornton police officers responded. Within a minute of their arrival, Officer Husk shot Ceballos to death in the street in front of his home. Ceballos's estate (also referenced herein as "Ceballos") and his surviving wife and children initiated this litigation against Officer Husk and the City of Thornton. Relevant here, Plaintiffs assert three claims: 1) a 42 U.S.C. § 1983 claim against Officer Husk, alleging he used excessive force in violation of the Fourth Amendment; 2) a § 1983 claim alleging the City failed to train Officer Husk adequately in how to handle situations involving individuals who are emotionally distraught or who have a diminished ability to reason; and 3) a state-law wrongful death tort claim against Husk. In this interlocutory appeal, Defendants challenge the district court's decision to deny them summary judgment on each of these three claims. We AFFIRM the district court's decision denying Officer Husk summary judgment on the § 1983 excessive-force claim. We DISMISS for lack of jurisdiction both the City's appeal from the denial of summary judgment on the § 1983 failure-to-train claim as well as Husk's appeal involving the state-law wrongful death claim.

# I. BACKGROUND

As the district court indicated throughout its decision, there remain numerous disputed issues of material fact underlying the claims at issue in this case. But in this interlocutory appeal from the denial of summary judgment premised in part on Officer Husk's assertion of qualified immunity, we "take as given the district court's assessment of what facts a reasonable jury could accept at trial," in light of the summary-judgment record. Walton v. Powell, 821 F.3d 1204, 1208 (10th Cir. 2016) (applying Johnson v. Jones, 515 U.S. 304, 317 (1995)). Further, we "view the facts in the light most favorable to the non-moving part[ies] and resolve all factual disputes and reasonable inferences in [their] favor." Knopf v. Williams, 884 F.3d 939, 946 (10th Cir. 2018) (internal quotation marks omitted).

## A. The shooting

Ceballos's wife called 911 at 7:30 p.m. on August 30, 2013, reporting, among other things, that her husband was in the driveway of their home "with two [baseball] bats and acting crazy; that she was afraid and had her 17-month old daughter with her; that Ceballos was drunk and probably on drugs; and that two of Ceballos' friends were with him." (Aplt. App. 707.) The 911 dispatcher issued a radio call regarding "a high priority disturbance involving a party armed with one or more bats, describing it as a 'DK [drunk] unwanted party' and a 'disturbance.'" (Id.) The dispatcher also indicated that Ceballos "is known to have knives." (Id. 214.) "Radio traffic" further reported that Ceballos had been a "'walkaway' from [a nearby medical center] the previous night." (Id. 707.)

3

The dispatcher sent officers further information about the situation over the "Computer-Aided Dispatch (CAD) system" (id. 707)—including information that Ceballos had threatened his wife with a knife several months earlier and that he was not taking his anti-depression medication. Husk, however, did not look at the CAD.

Husk arrived on scene at the same time as Officer Ward. Because the call occurred in his district, Husk took charge. The two officers

> parked near the vehicle in which [Quianna] Vigil had parked with her daughter, several houses down the street from the driveway where Ceballos was located. The officers spoke to Vigil and identified her as the reporting caller, and then began to walk toward Ceballos. As Officers Ward and Husk walked toward the residence, two men who had been with Ceballos, Andrew Castillo and Sergio Martinez, approached and told officers that Ceballos was not acting right and might be on drugs. Castillo and Martinez say that the officers refused to take additional information from them and continued to advance toward Ceballos. Castillo says he was told to "shut the fuck up" and "get back."

(Id. 707-08.)

At that time, two other officers arrived in separate cars; Commander Carbone parked near Husk's and Ward's patrol cars, while Officer Snook parked on the other side of Ceballos's home and began approaching Ceballos from the opposite direction as Husk and Ward. Officer Snook then decided to return to his vehicle to get a beanbag shotgun, which is non-lethal and can be fired at a greater distance than a Taser. Snook testified in his deposition

> that he recognized Ceballos from the walkaway incident the night before, and thought from observing him in the driveway that something in his face "didn't seem right." When Snook turned [to his patrol car] to get his [beanbag] shotgun, he did not think that either his own life or the lives of the other officers were in danger given their respective distances from Ceballos and that he was armed with a baseball bat.

4

(Id. 709-10.)

Not waiting for Officer Snook to return with the beanbag gun, Officers Husk and Ward continued to approach Ceballos. When they "were approximately 100 yards from the [Ceballos] residence, they saw Ceballos pacing in the driveway, swinging a baseball bat, yelling and throwing his arms in the air." (Id. 708.) There was no one else in the driveway with Ceballos. "By this time, the officers knew that [Ceballos's wife] and her daughter were parked down the street from Ceballos and that Ceballos' two friends had also left his immediate vicinity." (Id.) Furthermore, the officers "did not see any neighbors or other members of the public."[1] (Id.)

> Officers Husk and Ward walked in the middle of the street toward Ceballos to keep a clear line of sight. They both repeatedly shouted commands for Ceballos to drop the bat. Instead of doing so, he went into his garage. Either before or after Ceballos went into the garage, Officer Husk drew his firearm and Officer Ward drew his less lethal taser. Ceballos emerged from the garage with the bat in his hand and began walking toward the officers, who had their weapons drawn and continued shouting commands. The evidence is conflicting as to whether Ceballos was walking quickly or slowly toward the officers and whether Officers Husk and Ward continued to advance toward Ceballos or stopped their approach to give him an opportunity to comply with their commands. It is undisputed that he did not comply with their commands, instead responding with comments such as "Fuck you!" and "Or what, Motherfucker?" Officer Husk says he replied, "Or you will be shot," and continued to order him to stop and drop the bat. Officers Husk and Ward have testified that they did not retreat from Ceballos because, in accordance with their training, they wanted to try to contain him and

---

[1] Defendants assert that the officers did not know whether there was anyone else in Ceballos's house. But Defendants do not cite to any evidence that suggests there might have been someone else in the house. Officers could have asked Ceballos's wife and friends whether there was anyone else in the house, but the officers did not do so.

5

prevent him from running away and endangering the public. They also say they were in fear for their lives.

At some point Officer Ward fired his taser, but again the evidence is conflicting. . . . From this conflicting evidence a jury could infer that Officer Husk fired his gun at virtually the same time that Officer Ward deployed his taser, if not sooner.

(Id. 708-09.) Officer Snook, who had "sprinted" back to his car to get his beanbag shotgun (id. 709), had not yet returned when Ceballos was killed.

Officer Husk reported, after the incident, that he saw a knife in Ceballos' other hand as the distance narrowed between the officers and Ceballos. [Ceballos's friends] Castillo and Martinez say Ceballos was not carrying a knife. Officer Husk admits he never reported seeing this knife to any other officer until after he shot Ceballos, and that his commands to Ceballos were to drop the bat. Officers Ward and Snook and Commander Carbone did not see a knife until after Ceballos had been shot. A responding fire fighter reported seeing a closed pocketknife fall out of Ceballos' pocket after he had been shot, as responders rolled him over.

(Id. 710.)

## B. Officer training

Every Thornton police officer is trained on the proper use of force, including deadly force. As for the use of force "against mentally ill, emotionally disturbed, or individuals in crisis," the City "offers a 40-hour Crisis Intervention Training (CIT) course." (Id. 710.)

CIT is specifically designed to train officers to deal with people in crisis by using techniques such as maintaining safety by using time and distance; taking steps to calm the situation by using quiet voices; avoiding getting too close, too fast; not rushing into the situation; assessing the need for backup; making a plan with fellow officers for the best course of action; gathering information from those on the scene; avoiding escalating the situation; communicating in a calm, non-threatening

6

manner; not having multiple people giving commands at the same time; and containing the subject by establishing a perimeter.

(Id.)

CIT training is not mandatory for the City's officers and only half of them are CIT-trained. Relevant here, Officer Husk was not CIT-trained, but Officer Ward was. The officers in this case did not employ CIT strategies. Plaintiffs submitted expert evidence that the City "is not in compliance with industry standards" in CIT training (id. 711), and that "the failure to use de-escalation techniques, the department's action in not training Officer Husk in CIT, and Officer Husk's action in assuming responsibility for [a] mental health crisis situation simply because the call was in his district, were not consistent with well-established modern police standards" (id. 712).

## C. This litigation

Ceballos's estate ("Ceballos") and his surviving widow and two children ("Plaintiffs") sued Officer Husk and the City of Thornton, asserting both federal and state-law claims. Relevant here, the district court denied Defendants summary judgment on three claims: 1) Ceballos's 42 U.S.C. § 1983 claim alleging that Officer Husk used excessive force in violation of the Fourth Amendment; 2) Ceballos's § 1983 claim alleging the City failed to train Officer Husk adequately to deal with mentally ill or emotionally disturbed individuals; and 3) Plaintiffs' state-law wrongful death tort claim against Officer Husk. Defendants immediately appealed.

7

## II. LEGAL DISCUSSION

We start by acknowledging the obvious—the parties have very different views as to what happened on the August night in question. Plaintiffs assert that the circumstances at the moment Officer Husk shot Ceballos did not warrant the use of lethal force. Plaintiffs further contend that, even if lethal force was justified at that moment, Officer Husk's unreasonable conduct immediately preceding the shooting wrongfully provoked the need for lethal force. Moreover, Plaintiffs assert that, had the City trained its officers in how best to approach individuals in crisis—those who are emotionally disturbed, mentally ill or have diminished mental capacity due to, for example, drugs or alcohol—Officer Husk could have used that training to try to de-escalate the situation with Ceballos and perhaps avoid the need for lethal force.

Defendants, on the other hand, while conceding CIT training is valuable, contend that there was no time to use CIT methods to try to de-escalate this situation because of the risk Ceballos presented to public safety. Defendants assert it was incumbent upon officers to gain control of Ceballos as quickly as possible. With those two general perspectives in mind, we now address the specific issues presented by this interlocutory appeal.

### A. Ceballos's 42 U.S.C. § 1983 excessive-force claim against Officer Husk

Ceballos seeks damages from Officer Husk under § 1983, alleging that the officer violated the Fourth Amendment by using excessive force when he shot Ceballos. In his defense, Officer Husk moved for summary judgment, asserting he was entitled to qualified immunity.

8

We review the denial of a summary judgment motion raising qualified immunity questions de novo. Because of the underlying purposes of qualified immunity, we review summary judgment orders deciding qualified immunity questions differently from other summary judgment decisions. After a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff. Applying the same standards as the district court, we must determine whether the plaintiff has satisfied a heavy two-part burden. The plaintiff must first establish that the defendant's actions violated a constitutional or statutory right. If the plaintiff establishes a violation of a constitutional or statutory right, he must then demonstrate that the right at issue was clearly established at the time of the defendant's unlawful conduct. In determining whether the right was "clearly established," the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether the right was sufficiently clear that a reasonable officer would understand that what he is doing violates that right.

. . . If the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant the defendant qualified immunity. If the plaintiff successfully establishes the violation of a clearly established right, the burden shifts to the defendant, who must prove that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law. In short, although we review the evidence in the light most favorable to the nonmoving party, the record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity.

Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001) (citations, internal quotation marks, alteration omitted); see also Cox v. Glanz, 800 F.3d 1231, 1243 (10th Cir. 2015).

Here, the district court denied Officer Husk qualified immunity, ruling that Ceballos had stated a clearly established Fourth Amendment violation and that there were genuinely disputed issues of material fact that precluded granting the officer summary judgment on that Fourth Amendment claim. Although it is not clear from the record whether the district court properly applied the correct legal framework for ruling on a qualified-immunity defense raised in a summary judgment motion, our review of the court's summary judgment decision is de novo, and so we proceed

9

under the framework provided by Medina, 252 F3d at 1128, and Cox, 800 F.3d at 1243.

However, this court has jurisdiction to consider Husk's interlocutory appeal from the denial of qualified immunity only to the extent that it presents abstract issues of law.  See Mitchell v. Forsyth, 472 U.S. 511, 530 (1985).  We do not have jurisdiction to review the district court's determination that there are disputed factual issues that preclude summary judgment.  See Johnson, 515 U.S. at 307.

On appeal, Officer Husk does not challenge the clearly established general Fourth Amendment principles that the district court identified as applicable to the situation presented here.  Instead, Husk contends only that this clearly established law was not sufficiently precise and tailored to this factual scenario to apprise him that his conduct in this situation violated the Fourth Amendment.

To be clearly established, ordinarily there must be prior Supreme Court or Tenth Circuit precedent, "or the weight of authority from other circuits," that would have put an objective officer in Husk's position on notice that he was violating Ceballos's Fourth Amendment rights.  Carabajal v. City of Cheyenne, 847 F.3d 1203, 1210 (10th Cir.), cert. denied, 138 S. Ct. 211 (2017).  As the district court recognized,

> [a] police officer violates an arrestee's clearly established Fourth Amendment right to be free from excessive force during an arrest if the officer's actions were not "objectively reasonable" in light of the facts and circumstances confronting him. Graham v. Connor, 490 U.S. 386, 396 (1989).  Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires careful attention to the facts and circumstances of each particular case, including

10

the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. Id.

(Aplt. App. 712.)

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." . . . And "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."

Kisela v. Hughes, 138 S. Ct. 1148, 1152 (2018) (per curiam) (quoting Graham, 490 U.S. at 396-97). However, officers are not justified in using deadly force unless objectively reasonable officers in the same position "would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others." Thomson v. Salt Lake Cty., 584 F.3d 1304, 1313 (10th Cir. 2009) (internal quotation marks, emphasis omitted); see also Kisela, 138 S. Ct. at 1152 (discussing Tennessee v. Garner, 471 U.S. 1, 11 (1985)).

The district court further correctly recognized that

[t]he reasonableness of the use of force depends not only on whether the officers were in danger at the precise moment they used force but also on whether the officers' own conduct during the seizure unreasonably created the need to use such force. Hastings v. Barnes, 252 Fed. Appx. 197, 203 (10th Cir. 2007) (unpublished); see also Medina v. Cram, 252 F.3d 1124, 1132 (10th Cir. 2001); Allen v. Muskogee, Okl., 119 F.3d 837, 840 (10th Cir. 1997); Sevier v. City of Lawrence, Kan., 60 F.3d 695, 699 (10th Cir. 1995). However, only reckless and deliberate conduct that is "immediately connected to the seizure will be considered." Hastings, 252 Fed. Appx. at 203 (citing Medina, 252 F.3d at 1132).[2] Mere negligence

---

[2] We recently reaffirmed this longstanding Tenth Circuit law, notwithstanding County of Los Angeles v. Mendez, 137 S. Ct. 1539, 1547 n.8 (2017). See Pauly v.

11

or conduct attenuated by time or intervening events is not to be considered.  Id., citing Sevier, 60 F.3d at 699 n.8.  The mentally ill or disturbed condition of the suspect is a relevant factor in determining reasonableness of an officer's responses to a situation.  See Giannetti v. City of Stillwater, 216 Fed. Appx. 756, 764 (10th Cir. 2007) (unpublished); Allen, 119 F.3d at 840, 842; Sevier, 60 F.3d at 699, 701 and n.10.

(Aplt. App. 713 (footnote added).)  But "officers are not required to use alternative, less intrusive means if their conduct is objectively reasonable."  Jiron, 392 F.3d at 414.

Officer Husk does not dispute these clearly established Fourth Amendment principles.  Instead, he contends that this established law is too general to have warned him that the specific actions he took during the confrontation with Ceballos would violate the Fourth Amendment.

The Supreme Court has warned against defining a clearly established right "at a high level of generality."  White v. Pauly, 137 S. Ct. 548, 552 (2017) (per curiam) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011)).  Instead, "the clearly established law must be 'particularized' to the facts of the case."  Id. (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).  This is not to say that there must

---

White, 874 F.3d 1197, 1219 n.7 (10th Cir. 2017), cert. denied, 138 S. Ct. 2650 (2018); see also Clark v. Colbert, 895 F.3d 1258, 1264 (10th Cir. 2018) ("[P]olice officers can incur liability for 'reckless' conduct that begets a deadly confrontation," citing Allen, 119 F.3d at 841); Pauly, 874 F.3d at 1219-20 ("Our precedent recognizes that '[t]he reasonableness of the use of force depends not only on whether the officers were in danger at the precise moment that they used force, but also on whether the officers' own "reckless or deliberate conduct during the seizure unreasonably created the need to use such force."'" (quoting Jiron v. City of Lakewood, 392 F.3d 410, 415 (10th Cir. 2004) (quoting Sevier, 60 F.3d at 699)).

12

be "a case directly on point for a right to be clearly established." Kisela, 138 S. Ct. at 1152 (quoting White, 137 S. Ct. at 551). But the "existing precedent must have placed the statutory or constitutional question beyond debate." Id. (quoting White, 137 S. Ct. at 551). "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)).

### 1. Clearly established Tenth Circuit case law provided an objective officer in Husk's position notice that his conduct (as we accept it here) violated the Fourth Amendment

Here, Ceballos is able "to identify a [prior] case where an officer acting under similar circumstances as Officer [Husk] was held to have violated the Fourth Amendment." White, 137 S. Ct. at 552. That case is Allen v. Muskogee, 119 F.3d 837, 839-41 (10th Cir. 1997). There, Terry Allen "left his home after an altercation with his wife and children," taking ammunition and several guns with him. Id. at 839. Officers were told that Allen "was armed and had threatened family members," and that there was an eleven-year-old outstanding warrant for his arrest. Id. Allen drove to his sister's home and parked his car out front; she called police to report that Allen was "threatening suicide." Id. Three officers arrived to find that "Mr. Allen was sitting in the driver's seat with one foot out of the vehicle. He had a gun in his right hand, which was resting on the console between the seats." Id. Lieutenant Smith "approached the bystanders who were standing near Mr. Allen's vehicle, and ordered them to step back, which they did." Id.

13

As Lt. Smith repeatedly told Mr. Allen to drop his gun, Officer Bentley McDonald arrived and joined Lt. Smith at the driver's side door. Lt. Smith then reached into the vehicle and attempted to seize Mr. Allen's gun, while Officer Bentley held Mr. Allen's left arm. Officer Bryan Farmer, who arrived with Officer Bentley, approached Mr. Allen's car from the passenger side, and attempted to open a passenger side door. Mr. Allen reacted by pointing the gun toward Officer Farmer, who ducked and moved behind the car. Mr. Allen then swung the gun toward Lt. Smith and Officer McDonald, and shots were exchanged. Lt. Smith and Officer McDonald fired a total of twelve rounds into the vehicle, striking Mr. Allen four times. The entire sequence, from the time Lt. Smith arrived to the time Mr. Allen was killed, lasted approximately ninety seconds.

Id.

In analyzing these circumstances, Allen first set forth the relevant Fourth Amendment principles, the same principles the district court recognized in this case:

The excessive force inquiry includes not only the officers' actions at the moment that the threat was presented, but also may include their actions in the moments leading up to the suspect's threat of force. Of course, the use of force must be judged from the perspective of a reasonable officer on the scene, who is often forced to make split-second judgments about the amount of force that is necessary in a particular situation. However, . . . the reasonableness of Defendants' actions depends both on whether the officers were in danger at the precise moment that they used force and on whether Defendants' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force. We will thus consider an officer's conduct prior to the suspect's threat of force if the conduct is "immediately connected" to the suspect's threat of force.

Id. at 840 (citations, internal quotation marks, alteration omitted).

Applying these principles, Allen held that that a jury could find that the officers used excessive force under the circumstances presented in that case. Id. at 840-41. In particular, Allen noted that there was disputed evidence as to how Lt. Smith approached Allen: "[S]ome deposition testimony indicate[d] that Lt. Smith ran 'screaming' up to Mr. Allen's car and immediately began shouting at Mr. Allen to get

14

out of his car; other testimony indicates that Lt. Smith approached cautiously and tried talking Mr. Allen into giving up the gun." Id. at 841. Because "[t]he entire incident, from the time Lt. Smith arrived to the time of the shooting, took only ninety seconds[,] . . . the officers' preceding actions were so 'immediately connected' to Mr. Allen's threat of force that they should be included in the" inquiry into the reasonableness of the officers' actions. Id. In light of this evidence, Allen held that "a reasonable jury could conclude . . . that the officers' actions were reckless and precipitated the need to use deadly force." Id.

The circumstances at issue in Allen are closely analogous to those at issue here. Officer Husk shot and killed an emotionally distraught Ceballos within a minute of arriving on scene. Under the Estate's version of the facts—which Husk accepts as true for purposes of this appeal—Husk approached Ceballos quickly, screaming at Ceballos to drop the bat and refusing to give ground as Ceballos approached the officers.

In fact, the circumstances in Allen actually provide stronger justification for the police shooting at issue there. Allen was armed with a weapon—a gun—capable of harming someone from a much greater distance and with greater lethal potential than Ceballos's baseball bat (or at worst, his pocket knife). Further, unlike this case where there were no members of the public in the area when officers approached Ceballos, in Allen, the officers had to tell bystanders to get back as officers approached Allen's car. In Allen, then, there was arguably a more compelling reason for officers to take precipitous action and ultimately to use fatal force than is

15

presented in our case. Nevertheless, the Tenth Circuit held in Allen that the officers were not entitled to summary judgment on the issue of whether they violated Allen's constitutional rights. That case, then, was sufficient, *a fortiori*, to put Officer Husk on notice that his actions (as we must accept them here) violated Ceballos's Fourth Amendment rights.

Our conclusion, that Allen put Husk on notice that his conduct violated the Fourth Amendment, is bolstered by Tenth Circuit cases decided both before and after Allen. Before Allen, this court, in Sevier v. City of Lawrence, 60 F.3d 695, 697-99 (10th Cir. 1995), set forth the same legal principles that Allen later applied in factually similar circumstances—where officers shot and killed a despondent man who had a knife and had locked himself in his bedroom when, after coaxing him out of his room, the man refused to drop his knife and instead lunged at one of the officers. Ultimately, however, Sevier held this court did not have jurisdiction to consider Defendants' interlocutory appeal from the denial of qualified immunity and so we did not decide whether a jury could find that the officers violated the deceased's Fourth Amendment rights in that case. Id. at 700-01. Nevertheless, importantly, both the language and reasoning in Sevier was picked up and quoted in Allen during its analysis of the underlying Fourth Amendment law. See Allen, 119 F.3d at 840-41.

After Allen, this court, in an unpublished decision, applied the clearly established Fourth Amendment principles recognized in Allen, to uphold denying qualified immunity to four officers called to a home about a suicidal man, after they

16

chased the man into a small bedroom where, after he grabbed a samurai sword, they pepper sprayed him, causing him to lift the sword and move toward the officers. See Hastings v. Barnes, 252 F. App'x 197, 198-200, 203-07 (10th Cir. 2007) (unpublished). Neither Sevier, decided on jurisdictional grounds, nor the unpublished decision in Hastings, by themselves created the clearly established law that would have put an objective officer in Husk's position that his conduct in approaching and shooting Ceballos was unconstitutional.[3] But Sevier and Hastings strengthen our conclusion that, in light of Allen, a reasonable officer in Husk's position would have known that his conduct (viewed in the light most favorable to Ceballos) violated his Fourth Amendment right to be free from excessive force.

**2. Officer Husk's attempts to distinguish Allen from the circumstances at issue here are unpersuasive**

Officer Husk's attempt to distinguish Allen is unpersuasive. He contends that, in Allen, the responding officers' knowledge that the suspect was suicidal or suffered from a "mental illness or disability . . . required a modified response," while in this case Officer Husk did not know that Ceballos had a mental illness or disability. (Aplt. Br. 22.) We decline to cabin Allen so narrowly. The facts here, as we must accept them, made clear that the responding officers knew Ceballos's capacity to reason was diminished, whatever the underlying reason might have been—mental

---

[3] "Although not dispositive . . . because of its unpublished status," Estate of Booker v. Gomez, 745 F.3d 405, 428 n.29 (10th Cir. 2014), "we have never held that a district court must ignore unpublished opinions in deciding whether the law is clearly established," Morris v. Noe, 672 F.3d 1185, 1197 n.5 (10th Cir. 2012).

17

health problems, emotional distress, drunkenness, or drugs. The dispatcher described Ceballos to the responding officers as "acting crazy," drunk, and possibly on drugs. (Aplt. App. 707.) When officers arrived, they saw Ceballos pacing in his driveway, swinging a bat and yelling at no one in particular. Ceballos's two companions had told the officers that "Ceballos was not acting right and might be on drugs." (Id. 707-08.) One of the responding officers recognized that Ceballos "didn't seem right." (Id. 709.) In light of all that, a jury might reasonably find that an objective officer in Husk's position should have recognized that as well and would have taken those facts into account before provoking a fatal encounter. These facts are sufficient for Allen to provide clearly established guidance to an objective officer in Husk's position.

Officer Husk also contends that officers here were investigating "violent criminal activity," while in Allen officers were instead conducting a welfare check. (Aplt. Br. 23.) But in Allen, the decedent had a gun and, like Ceballos, had threatened his family members earlier that same day. See 119 F.3d at 839. Officers also knew there was an outstanding arrest warrant for Allen, albeit an old one. Id. The situations presented here and in Allen are sufficiently analogous for Allen to provide Husk with notice that his actions, as we accept them here, were unconstitutional.

Husk argues that, while the decedent in Allen, though armed, was not acting aggressively prior to the officers' intervention and became aggressive only after being provoked by the officers' challenged actions, Ceballos was already pacing in

18

his driveway, swinging a bat and yelling, when officers arrived. Even so, Ceballos did not retreat into his garage and then become aggressive toward the officers until Officers Husk and Ward approached him directly, both yelling commands at him. Ceballos's prior conduct in his own driveway, which posed harm to no one, does not meaningfully distinguish this case from the circumstances at issue in Allen and such conduct surely could not lead reasonable officers to believe they were justified in fatally shooting Ceballos within one minute of the initial encounter. Thus, Officer Husk's arguments attempting to distinguish Allen ultimately fall short.

Officer Husk next asserts that there are other Tenth Circuit cases that support his qualified-immunity defense. But the cases on which he relies are distinguishable. In Jiron, 392 F.3d at 411-13, 418-19, Medina, 252 F.3d at 1126-27, 1132, and Thomson, 584 F.3d at 1309-10, 1320, the officers were entitled to qualified immunity for using deadly force to keep an armed suspect from escaping into the general public or to locate and stop an armed person who had already escaped into the general public. That was not the situation presented here. There was no one near Ceballos when the Thornton officers approached him, and Ceballos remained in his driveway or garage. Further, the mere possibility that Ceballos might have presented a threat to the general public, had he left his driveway, does not weigh heavily on Officer Husk's side. See Cordova v. Aragon, 569 F.3d 1183, 1190 (10th Cir. 2009) (holding that officers' conduct in shooting a suspect who was driving the wrong way on a highway was not made reasonable by the "mere possibility" that the suspect posed a threat to "fellow motorists" where the facts at issue "do not . . . show that any other

19

motorists were in the vicinity, or that other motorists would not be able to spot Mr. Cordova and avoid an accident themselves"); see also Garner, 471 U.S. at 11 ("Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force.").

Officer Husk also relies on Estate of Larsen v. Murr, 511 F.3d 1255 (10th Cir. 2008). But there are a number of facts that distinguish Larsen from this case, the most relevant being that the plaintiff in Larsen did not claim that the officers' conduct caused the need for them to use deadly force. See id. at 1259-64.

We conclude, then, that this court's decision in Allen adequately notified Officer Husk that his conduct in confronting Ceballos (as we accept the facts here) violated the Fourth Amendment. We, therefore, affirm the district court's decision to deny Officer Husk qualified immunity.

**3. Response to dissent**

**a. "Obviously unconstitutional" exception to qualified immunity**

At pages 17-20, the dissent addresses a possible argument to defeat qualified immunity that was not raised by the plaintiff—that the officer's conduct was so obviously unconstitutional that it is not necessary for the plaintiff to show clearly established existing law prohibiting such conduct. Although we agree that argument is a potential ground for defeating qualified immunity, see, e.g., District of Columbia v. Wesby, 138 S. Ct. 577, 590 (2018) (recognizing "there can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even

20

though existing precedent does not address similar circumstances"); Halley v. Huckaby, 902 F.3d 1136, 1149 (10th Cir. 2018), petition for cert. filed, (U.S. Jan. 29, 2019) (No. 18-986), we do not address this argument because the plaintiff did not assert it.

### b. Reliance on case law decided after the events giving rise to this litigation

The dissent relies on two cases, Clark v. Colbert, 895 F.3d 1258 (10th Cir. 2018), and Apodaca v. Raemisch, 864 F.3d 1071 (10th Cir. 2017), cert. denied, 139 S. Ct. 5 (2018), that were decided after Husk shot Ceballos to show that the law was not clearly established. (Dissent 12 n.4, 12-13, & 20.) But our focus in deciding whether a constitutional right was clearly established is, instead, at the time the challenged conduct occurred. See Kisela, 138 S. Ct. at 1152. "Necessarily, resolution of this second [qualified-immunity] inquiry is governed by cases published before" Officer Husk shot Ceballos. Herrera v. City of Albuquerque, 589 F.3d 1064, 1071 (10th Cir. 2009) (internal quotation marks omitted); see also Wesby, 138 S. Ct. at 589 ("To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent."); Plumhoff v. Rickard, 572 U.S. 765, 779 (2014) (noting later decided cases could not give fair notice to officer).

Clark is easily distinguishable and not on point. In Clark, Clark's brother called police to report that he was having trouble restraining Clark, a schizophrenic individual suffering a psychotic episode. 895 F.3d at 1260. When sheriff's deputies arrived, they had trouble communicating with the "irritated" Clark, who was standing

on his front porch holding a long knife.  Id. at 1262.  Very different from our case, deputies withdrew from Clark; called for backup; waited ten minutes for several additional officers to arrive; when the additional officers got there, the entire group planned a strategy to arrest Clark; they gathered "an array of nonlethal resources" to use when they approached Clark; and officers actually employed those nonlethal resources, ultimately unsuccessfully, before having to shoot Clark, who survived the non-lethal shots.  Id. at 1262-63.  This court determined that a reasonable jury could not find that the officers' conduct in Clark was unreasonable.  Id. at 1261-64.  The police conduct at issue in Clark is the antithesis of the manner in which Officer Husk approached Ceballos (as we must accept those facts for our purposes here).  The actions that the police took in Clark are the very kind of actions that Plaintiffs assert Officer Husk should have undertaken before confronting Ceballos.

The other post-event case that the dissent improperly relies on is Apodaca, 864 F.3d 1071, but it was also distinguishable.  In Apodaca it wasn't clear what facts were relied on in the earlier Perkins decision.  Although the plaintiff alleged he had been deprived of all out-of-cell exercise, we used imprecise language in Perkins indicating that plaintiff was merely deprived only of "outdoor" exercise.  In light of this ambiguity, it wasn't clearly established for purposes of Apodaca (where there was a denial of outdoor exercise but not out-of-cell exercise) that Perkins applied.  In other words, in Apodaca, this court said a reasonable officer could read Perkins alone and not know what specific conduct Perkins prohibited.  That problem does not arise here.  Here, the legal right at issue is clear—that an officer violates the Fourth

22

Amendment when his or her reckless or deliberate conduct results in the need for lethal force or when the officers rely on lethal force unreasonably as a first resort in confronting an irrational suspect who is armed only with a weapon of short-range lethality and who has been confined on his own property. Allen clearly established that constitutional right.

### c. Dissent's improper reliance on hypothetical possibilities or disputed facts

In concluding that Husk's conduct did not violate rights clearly established in Allen, the dissent states that, different from Allen, Ceballos might have fled or he might have "enter[ed] another home in the neighborhood," and "the officers might reasonably have thought that [Ceballos] was retrieving a gun" from the garage. (Dissent at 10 & 11.) But there are simply no facts in the record, as we must accept it for purposes of this interlocutory appeal, that suggest any of these "facts." Furthermore, although the dissent states a number of times that Ceballos was in a "residential neighborhood" (id. at 1, 8,12, 13), the specific facts that we must accept here are that he was in his own driveway, with no one else around, and he was fully contained at the time he was shot and killed.

### d. The dissent's reliance on Thomson is misplaced

Given the facts as we must accept them here, the dissent's reliance on Thomson is misplaced. The dissent contends that a reasonable officer in Husk's position would not have known that the manner in which he approached Ceballos violated the Fourth Amendment. But Thomson is not factually analogous to the

23

situation presented here and, therefore, could not have informed Husk as to the constitutionality of his actions at the time he took them.

The situation in Thomson was that Chad Thomson threatened his wife with a gun and also threatened suicide before leaving his home with a gun at 2:00 a.m. 584 F.3d at 1309-10. Police arrived, confirmed a gun was missing from the Thomson home, and then began a yard-by-yard search for Thomson in the "darkened neighborhood," aided by a police dog. Id. at 1310. While officers were searching, Thomson relayed to a police lieutenant, via a phone call through Thomson's friend, that if officers did not want to get hurt, they should leave the area. Id. When the dissent says, then, that "The Thomson suspect was in a residential neighborhood; Mr. Ceballos was too" (Dissent 13), we cannot agree. Unlike in our case, an agitated and armed Thomson had already escaped somewhere in the dark neighborhood when police arrived. Under those circumstances, this court held that officers acted reasonably in searching for Thomson and in using a police dog to assist in that search. See Thomson, 584 F.3d at 1320-22. Moreover, unlike here, Thomson was armed with a gun that he pointed at officers, at the police dog biting him, and at himself during the ten seconds after officers found Thomson and before they shot him. Id. at 1311, 1317-18. The facts in Thomson are not analogous to the circumstances presented here.

For all of these reasons, we respectfully disagree with the dissent's analytical framework and the conclusion the dissent reaches. Instead, we conclude, based on the facts as they are presented to us here on this interlocutory appeal, that the Tenth

24

Circuit decision in Allen would have put a reasonable officer on notice that the reckless manner in which Husk approached Ceballos and his precipitous resort to lethal force violated clearly established Fourth Amendment law

## B. Ceballos's § 1983 failure-to-train claim against the City

The City appeals the district court's decision to deny it summary judgment on Ceballos § 1983 claim alleging that the City failed to train its officers adequately in how best to deal with mentally ill or emotionally disturbed individuals. Acknowledging that ordinarily it cannot immediately appeal the denial of summary judgment, see Moore v. City of Wynnewood, 57 F.3d 924, 929 (10th Cir. 1995) (citing Swint v. Chambers Cty. Comm'n, 514 U.S. 35, 41-42 (1995)), the City asks us, nevertheless, to exercise pendent appellate jurisdiction here to consider the City's interlocutory appeal. We have discretion to exercise pendent appellate jurisdiction "where the otherwise nonappealable decision is 'inextricably intertwined' with the appealable decision, or where review of the nonappealable decision is 'necessary to ensure meaningful review' of the appealable one." Moore, 57 F.3d at 930 (quoting Swint, 514 U.S. at 51). But, because "the exercise of pendent appellate jurisdiction is generally disfavored[,] . . . [w]e exercise this discretionary authority sparingly." Cox, 800 F.3d at 1255-56 (internal quotation marks omitted).

The City claims that its appeal is "inextricably intertwined" with Officer Husk's permissible appeal from the denial of qualified immunity.

> [A] pendent appellate claim can be regarded as inextricably intertwined
> with a properly reviewable claim on collateral appeal only if the pendent
> claim is coterminous with, or subsumed in, the claim before the court on

25

interlocutory appeal—that is, when the appellate resolution of the collateral appeal *necessarily* resolves the pendent claim as well.

Moore, 57 F.3d at 930 (applying Swint). That is not the case here.

Officer Husk's permissible interlocutory appeal raised the legal question of whether the district court erred in identifying clearly established law that put the officer on notice that his use of force, as Ceballos alleges it, was excessive and in violation of the Fourth Amendment. The City's interlocutory appeal involves, instead, the City's training of its officers.

> In order to prevail on a claim against a municipality for failure to train its police officers in the use of force, a Plaintiff must first prove the training was in fact inadequate, and then satisfy the following requirements:
>
>> (1) the officers exceeded constitutional limitations on the use of force; (2) the use of force arose under circumstances that constitute a usual and recurring situation[] with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the part of the city toward persons with whom the police officers come into contact, and (4) there is a direct causal link between the constitutional deprivation and the inadequate training.

Carr v. Castle, 337 F.3d 1221, 1228 (10th Cir. 2003) (quoting, e.g., City of Canton v. Harris, 489 U.S. 378, 388 (1989), and Allen, 119 F.3d at 841-42). In denying the City summary judgment, the district court ruled that Ceballos had established the second enumerated element of his failure-to-train claim and that there were genuinely disputed material issues of fact as to the remaining elements.

On appeal, the City reasserts its argument that there is no evidence that its training was inadequate, but that if its training was inadequate, there is no evidence that any inadequacy rose to the level of deliberate indifference or caused any

26

unconstitutional use of force against Ceballos. These issues do no overlap with the issue Officer Husk permissibly raised in his interlocutory appeal. Moreover, in resolving Officer Husk's interlocutory appeal, we concluded there was clearly established law that put the officer on notice that the alleged force he used against Ceballos was unconstitutional. But that determination does not "*necessarily resolve[]* " Moore, 57 F.3d at 930, the training issues that the City raises in its appeal. We, therefore, decline to exercise pendent jurisdiction over the City's interlocutory appeal.

## C. State-law wrongful death claim against Officer Husk

Ceballos's widow and children assert a wrongful death tort claim against Officer Husk under Colorado law. Husk claims he is immune from such a tort claim under the Colorado Governmental Immunity Act ("CGIA"), Colo. Rev. Stat. §§ 24-10-101 to 24-10-120, which provides that a public employee acting within the scope of his employment is immune from liability for any tort claim unless the employee's conduct "was willful and wanton," id. § 24-10-111(2)(a).[4] Colorado treats this

---

[4] More specifically, § 24-10-118(2)(a) provides, in relevant part:

A public employee shall be immune from liability in any claim for injury, whether brought pursuant to this article, section 29-5-111, C.R.S.[(addressing peace officers' liability and employers' indemnification of peace officers)], the common law, or otherwise, which lies in tort or could lie in tort regardless of whether that may be the type of action or the form of relief chosen by a claimant and which arises out of an act or omission of such employee occurring during the performance of his duties and within the scope of his employment unless the act or omission causing such injury was willful and wanton . . . .

27

statutory immunity as sovereign immunity from suit.  See Martinez v. Estate of

Bleck, 379 P.3d 315, 317, 320-22 (Colo. 2016).  It is not, however, Eleventh

Amendment immunity.  See Griess v. Colorado, 841 F.2d 1042, 1044-45 (10th Cir.

1988) (per curiam).  Instead this CGIA immunity involves "tort liability of the state

enforceable in its own courts." id. (citing, among other provisions of the CGIA, Colo.

Rev. Stat. §§ 24-10-119[5]), which federal courts, under Erie, honor when exercising

supplemental jurisdiction over a Colorado tort claim asserted against a public

employee,[6] see 13 Charles Alan Wright, et al., Federal Practice & Procedure,

§3524.2, p.371 (3d ed. 2008); see also Beard v. City of Northglenn, 24 F.3d 110, 118

(10th Cir. 1994) (applying Colo. Rev. Stat. § 24-10-118(2)(a) to Colorado tort claim

asserted in federal action).[7]

_____

(Emphasis added.)

[5] Section 24-10-119 provides in relevant part that "[t]he provisions of this article shall apply to any action against a public entity or a public employee in any court of this state having jurisdiction over any claim brought pursuant to any federal law, if such action lies in tort or could lie in tort . . . ."

[6] Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938) (addressing federal courts' diversity jurisdiction); see Aspen Orthopaedics & Sports Medicine, LLC v. Aspen Valley Hosp. Dist., 353 F.3d 832, 836-37 (10th Cir. 2003) (applying Erie principles when exercising supplemental jurisdiction over state-law claim).

[7] Wright and Miller distinguish between Eleventh Amendment immunity and a State's state-law sovereign immunity from liability in its own courts.  More specifically, in discussing Eleventh Amendment immunity, Wright and Miller note:

A related aspect of the Erie doctrine . . . arises when state-granted immunity is honored by a federal court sitting in diversity.  A state has the power to grant immunity in its own courts to officers, agents, or other

28

In the district court, Officer Husk sought summary judgment, asserting that he is entitled to immunity from tort liability under the CGIA because Plaintiffs have no evidence that his conduct in shooting Ceballos was willful and wanton. See Smith v. Bd. of Educ. of Sch. Dist. Fremont RE-1, 83 P.3d 1157, 1167 (Colo. Ct. App. 2003) (stating that "the plaintiff must prove that the defendant's action was willful and wanton"); see also L.J. v. Carricato, 413 P.3d 1280, 1288 (Colo. Ct. App. 2018). The district court rejected Husk's argument for summary judgment, ruling:

> The disputed evidence here—including the combination of haste, failure to gather information, failure to use de-escalation techniques, lack of apparent immediate danger to the public, failure to wait for Officer Snook to retrieve his less lethal shotgun, and the creation of exigent circumstances by the officers' own actions—could support a reasonable inference of willful and wanton disregard of Ceballos' rights and safety.

(Aplt. App. 717.)

Officer Husk challenges the district court's decision to deny him summary judgment on his CGIA-immunity defense in this interlocutory appeal. As the

---

governmental entities. Consistent with the Erie doctrine, a federal court sitting in diversity will honor these immunities and dismiss the actions. It is important, however, to distinguish these state immunity Erie dismissals from bona fide Eleventh Amendment constitutional questions.

13 Wright, et al., Federal Practice and Procedure, § 3524.2, p.371. Although Wright & Miller address the application of Erie in diversity cases, see 28 U.S.C. § 1331, those same principles also apply here, where federal courts are instead exercising supplemental jurisdiction, see 28 U.S.C. § 1367, over the state-law wrongful death tort claim, see Aspen Orthopaedics, 353 F.3d at 836-37. This is the distinction the Tenth Circuit drew in Griess, when this court held that Colorado's enactment of the CGIA immunity provision at issue here did not waive the State's Eleventh Amendment immunity from suit in federal court on a federal § 1983 claim. See 841 F.2d at 1044-45.

29

appellant, he bears the burden of establishing our appellate jurisdiction. See

E.E.O.C. v. PJ Utah, LLC, 822 F.3d 536, 542 n.7 (10th Cir. 2016). Husk has failed

to meet his burden. He incorrectly asserts that we have jurisdiction to consider this

portion of his interlocutory appeal because Colorado law provides for such an

interlocutory appeal from the denial of immunity under the CGIA. See Colo. Rev.

Stat. § 24-10-118(2.5).[8] It is "federal, not state, law [that] controls the appealability

of the district court's order" in federal court. Aspen Orthopaedics, 353 F.3d at 837.

Husk offers no basis grounded in federal law that permits us to consider this portion

of his interlocutory appeal. See Raley v. Hyundai Motor Co., 642 F.3d 1271, 1275

(10th Cir. 2011) ("It is appellant's burden, not ours, to conjure up possible theories to

invoke our legal authority to hear h[is] appeal."); see also United States ex rel.

Ramseyer v. Century Healthcare Corp., 90 F.3d 1514, 1518 n.2 (10th Cir. 1996).

We, therefore, dismiss this portion of his interlocutory appeal for lack of appellate

jurisdiction.[9]

---

[8] The CGIA provides:

> If a public employee raises the issue of sovereign immunity prior to or after
> the commencement of discovery, the court shall suspend discovery; except
> that any discovery necessary to decide the issue of sovereign immunity shall
> be allowed to proceed, and the court shall decide such issue on motion. The
> court's decision on such motion shall be a final judgment and shall be subject
> to interlocutory appeal.

Colo. Rev. Stat. § 24-10-118(2.5).

[9] We further note that the evidentiary issue presented in this portion of Husk's
appeal—whether the district court was correct that there is sufficient evidence for a
jury to find that he acted willfully and wantonly—is the type of question that we

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's decision to deny Officer Husk qualified immunity on the § 1983 excessive-force claim. We DISMISS for lack of appellate jurisdiction both the City's appeal from the denial of summary judgment on the § 1983 failure-to-train claim and Husk's appeal regarding the state-law wrongful death claim.

---

would not have jurisdiction to consider in an interlocutory appeal even from the denial of qualified immunity from § 1983 liability. See Johnson, 515 U.S. at 307.

*Estate of Jaime Ceballos, et al. v. William Husk, et al.*, No. 17-1216
**BACHARACH**, J., concurring in part and dissenting in part.

Officer William Husk responded to a 911 report that Mr. Jaime Ceballos was armed and creating a disturbance in a residential neighborhood. Officer Husk's response led to a confrontation in which he fatally shot Mr. Ceballos. Mr. Ceballos's estate and family sued, bringing four claims:

1.   a claim against Officer Husk under 42 U.S.C. § 1983, alleging excessive force in violation of the Fourteenth Amendment,

2.   a § 1983 claim against the City of Thornton for failing to adequately train Officer Husk,

3.   a claim against the City for violating the Americans with Disabilities Act, and

4.   a state-law claim against Officer Husk for wrongful death.

Officer Husk and the City of Thornton moved for summary judgment. The district court granted summary judgment to the City on the claim under the Americans with Disabilities Act; in all other respects, the district court denied the motion for summary judgment, leading Officer Husk and the City to appeal.

I agree with the majority that we lack jurisdiction over (1) the City's appeal on the failure-to-train claim and (2) Officer Husk's appeal on the wrongful-death claim. But I respectfully disagree with the majority's discussion in Part II(A), which upholds the denial of summary judgment to Officer Husk on the § 1983 claim of excessive force. In my view, Officer

Husk enjoys qualified immunity because the constitutionality of his conduct fell within the realm of reasonable debate. So I would reverse the district court's denial of Officer Husk's motion for summary judgment on the claim under § 1983.

I.    **The Standards for Qualified Immunity and Excessive Force**

We engage in de novo review of the denial of summary judgment based on qualified immunity. *Henderson v. Glanz*, 813 F.3d 938, 951 (10th Cir. 2015). In conducting this review, we consider the district court's factual findings and reasonable assumptions drawn from the summary judgment evidence. *Cox v. Glanz*, 800 F.3d 1231, 1242 (10th Cir. 2015). Based on this universe of factual findings and reasonable assumptions, the plaintiffs bore the burden to defeat Officer Husk's defense of qualified immunity. *Id.* at 1245. We thus consider whether the plaintiffs showed

- that Officer Husk had violated a constitutional right and

- that this right had been clearly established.

*Apodaca v. Raemisch*, 864 F.3d 1071, 1076 (10th Cir. 2017).

The majority concludes that the plaintiffs' evidence created a triable fact issue on the existence of a constitutional violation. Here the alleged constitutional violation involves the Fourth Amendment. For a Fourth Amendment claim of excessive force, we consider the totality of circumstances from the perspective of a reasonable officer on the scene.

*Estate of Larsen* ex rel. *Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008).

These circumstances include whether Officer Husk recklessly or intentionally created the need to use force. *See Medina v. Cram*, 252 F.3d 1124, 1132 (10th Cir. 2001) (observing that an officer's conduct prior to the creation of a threat bears on the reasonableness of the force). We also consider four other non-exclusive factors bearing on the immediacy and severity of the danger to Officer Husk when he approached Mr. Ceballos:

1. whether Officer Husk ordered Mr. Ceballos to drop his weapon and whether Mr. Ceballos complied,

2. whether Mr. Ceballos made any hostile motions toward the officers,

3. the distance between Officer Husk and Mr. Ceballos, and

4. the manifest intentions of Mr. Ceballos.

*See Estate of Larsen*, 511 F.3d at 1260.

When assessing the totality of circumstances, we must consider the sequence of events. The use of force may be unreasonable even in the face of an immediate, severe danger if the officer had recklessly created the danger. *See Allen v. Muskogee*, 119 F.3d 837, 839–41 (10th Cir. 1997) (concluding that an officer's use of deadly force against a suspect, who was pointing a gun at the officer, may have been excessive if the officer had recklessly or intentionally created the danger). The reverse is also true: even if an officer does not recklessly or intentionally create the need

3

for deadly force, it may still be excessive if the officer faced no immediate danger. *See Fancher v. Barrientos*, 723 F.3d 1191, 1200–01 (10th Cir. 2013) (concluding that an officer's use of deadly force against a suspect, who had created a dangerous situation, was not reasonable after the danger had passed). So we should consider the reasonableness of Officer Husk's conduct in two discrete time-periods:

1. the time leading to his confrontation with Mr. Ceballos and

2. the time of the actual confrontation.

Let's assume, for the sake of argument, that Officer Husk violated the Fourth Amendment. He would still enjoy qualified immunity unless he had violated a clearly established constitutional right. *See* p. 2, above. A constitutional right is clearly established when a Tenth Circuit or Supreme Court precedent is on point, making the unlawfulness of the conduct apparent. *Apodaca v. Raemisch*, 864 F.3d 1071, 1076 (10th Cir. 2017). In deciding whether a precedent is on point, we cannot define the right at a "'high level of generality.'" *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Instead, the precedent must be particularized to the facts. *Id.*

A precedent can be particularized to the facts in one of two ways. First, the precedent may involve a determination that materially similar conduct is unlawful. *Apodaca*, 864 F.3d at 1076. Second, a general precedent may be considered specific enough "when the defendant's

4

conduct 'obviously' violates the law." *Id.* (quoting *White*, 137 S. Ct. at 552). "Thus, a right is clearly established when a precedent involves 'materially similar conduct' or applies with 'obvious clarity' to the conduct at issue." *Apodaca*, 864 F.3d at 1076 (emphasis removed) (quoting *Estate of Reat v. Rodriguez*, 824 F.3d 960, 964–65 (10th Cir. 2016)).

By confining our analysis to precedents involving materially similar conduct or applying with obvious applicability, we ensure that officers receive fair notice about the conduct deemed unconstitutional. *Brosseau v. Haugen*, 543 U.S. 194, 198–99 (2004) (per curiam). Given the need for fair notice, police officers enjoy qualified immunity absent a precedent that "'squarely governs' the specific facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015) (per curiam)).

"[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix*, 136 S. Ct. at 308 (internal quotation marks omitted). Given the need for specificity, police officers would incur personal liability only when the underlying constitutional violation has been established "'beyond debate.'" *Apodaca*, 864 F.3d at 1076 (quoting *White¸* 137 S. Ct. at 551). Put another way, police officers enjoy qualified immunity unless they showed plain

5

incompetence or knowingly violated the law. *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

We consider this standard against the Fourth Amendment test for claims of excessive force. Analysis of excessive-force claims is inherently fact-intensive, turning on a balance of factors rather than bright-line rules. *Graham v. Connor*, 490 U.S. 386, 396 (1989); *see Estate of Larsen* ex rel. *Sturdivan v. Murr*, 511 F.3d 1255, 1262 (10th Cir. 2008) (stating that bright-line rules do not exist for deciding whether the use of deadly force was objectively reasonable); *see also Fisher v. City of Las Cruces*, 584 F.3d 888, 894 (10th Cir. 2009) ("[T]he Fourth Amendment's reasonableness inquiry notoriously eludes easy formula or bright line rules."). The balancing of factors often creates uncertainty for police officers over the lawfulness of their conduct. *See Cavanaugh v. Woods Cross City*, 625 F.3d 661, 666 (10th Cir. 2010) (stating that for qualified immunity, "[o]n-point cases are particularly important when the constitutional question involves a balancing test"); *see also Columbian Fin. Corp. v. Stark*, 811 F.3d 390, 402 (10th Cir. 2016) (holding that state regulators' conduct did not violate a clearly established constitutional right because the underlying test involved balancing multiple factors and the defendants faced "inherent uncertainty in how our court or the Supreme Court would apply the fact-intensive balancing test"); *accord Foy v.*

6

*Holston*, 94 F.3d 1528, 1535 n.8 (11th Cir. 1996).[1] Navigating the uncertainty of a balancing test becomes even more difficult when police officers must act quickly. *See Marquez v. Albuquerque*, 399 F.3d 1216, 1220 (10th Cir. 2005).

## II.    Creation of the Danger

Officer Husk had to act quickly once he confronted Mr. Ceballos, who was yelling and wildly swinging a baseball bat. But the plaintiffs contend that Officer Husk created the danger by needlessly confronting Mr. Ceballos. Had Officer Husk recklessly or intentionally created the danger, his later use of deadly force may have been unreasonable. *See Medina v. Cram*, 252 F.3d 1124, 1132 (10th Cir. 2001). We thus consider Officer Husk's actions leading to the confrontation with Mr. Ceballos.

A police dispatcher issued a high-priority request for service, reporting that Mr. Ceballos was a "[drunk], unwanted party" in a

---

[1]    In *Foy*, the court said:

> When the law contemplates some kind of balancing test to determine the ultimate question of lawfulness or unlawfulness of an act, qualified immunity almost always applies to shield the public servant defendant: the lack of bright lines associated with balancing tests prevents the preexisting law, given the circumstances of a specific case, from having been clearly established when the public servant took the step that resulted in his later being a defendant in a lawsuit.

94 F.3d at 1535 n.8.

7

residential neighborhood and was carrying one or more baseball bats. Officer Husk responded, along with a second officer (Officer Eric Ward). When the officers arrived at the scene, they spotted

- Mr. Ceballos's wife and infant daughter and

- two friends of Mr. Ceballos.

For the sake of argument, we may assume that Officer Husk prematurely confronted Mr. Ceballos. Rather than stop and ask questions, Officer Husk passed Mr. Ceballos's wife and friends and approached Mr. Ceballos. When about 100 yards away, Officer Husk saw Mr. Ceballos swinging a baseball bat, pacing, yelling, and throwing his arms in the air.

Officers Husk and Ward continued to approach Mr. Ceballos and ordered him to drop the bat. Mr. Ceballos refused. Instead of dropping the bat, Mr. Ceballos entered his garage, where he was shielded from the officers' view. Officer Husk pulled out a gun and continued to advance without waiting for a third officer to retrieve a less-lethal weapon. Mr. Ceballos emerged from the garage with the bat and walked toward the officers.

The officers continued ordering Mr. Ceballos to drop the bat. Mr. Ceballos refused and spewed expletives, like "Fuck you!" and "Or what, Motherfucker?" Officer Husk warned that he would shoot if Mr. Ceballos

did not comply. The men continued to approach each other until they were 12-to-20 feet apart.[2] Officer Husk then shot Mr. Ceballos.

For the sake of argument, we can assume that Officer Husk recklessly or intentionally created the need to use deadly force. Even with this assumption, Officer Husk would enjoy qualified immunity for his conduct leading to the use of force unless his conduct violated a clearly established constitutional right.

The plaintiffs rely on three opinions to show that Officer Husk violated a clearly established constitutional right: *Hastings v. Barnes*, 252 F. App'x 197 (10th Cir. 2007) (unpublished), *Sevier v. City of Lawrence*, 60 F.3d 695 (10th Cir. 1995), and *Allen v. Muskogee, Okla.*, 119 F.3d 837 (10th Cir. 1997). The plaintiffs' reliance on *Hastings* and *Sevier* is misguided. *Hastings* does not constitute precedent and "provide[s] little support for the notion that the law is clearly established." *Knopf v. Williams*, 884 F.3d 939, 947 (10th Cir. 2018) (quoting *Mecham v. Frazier*, 500 F.3d 1200, 1206 (10th Cir. 2007)); *see also Estate of Bleck v. Alamosa*, 643 F. App'x 754, 757 (10th Cir. 2016) (unpublished) (upholding

---

[2] The district court did not make a finding of fact regarding the distance between Officer Husk and Mr. Ceballos when the gun was fired. The court noted that Officers Husk and Ward had testified that the distance was no more than 20 feet and a minimum of 12 to 15 feet. The plaintiffs have conceded that Officer Husk was about 20 feet away from Mr. Ceballos when the gun was fired. I thus assume the two men were between 12 and 20 feet apart.

summary judgment for police officers in part because *Hastings* was unpublished and distinguishable). And in *Sevier*, we held only that our court lacked jurisdiction; we did not clearly establish any right. 60 F.3d at 700–01.

Nor did *Allen* clearly establish a constitutional violation from Officer Husk's conduct. In *Allen*, the police responded to a report that a man had threatened his family members, was contemplating suicide, and was sitting outside with a gun. 119 F.3d at 839. When police officers arrived, they saw the suspect sitting in a car with a gun in his hand, resting on the console. *Id.* According to the plaintiffs' evidence, the officers ran to the car, screaming and reaching into the window to pry the gun out of the suspect's hand. *Id.* at 841. In the ensuing struggle, the suspect pointed his gun at the officers, who then shot the suspect. *Id.* at 839. We concluded that a reasonable jury could have found a violation of the Fourth Amendment. *Id.* at 841.

Although some similarities exist between *Allen* and our case, the conduct in the two cases was substantially different. As in *Allen*, the officer here was called to respond to a report of a disturbed man with a weapon outside a home. Unlike the suspect in *Allen*, however, Mr. Ceballos was mobile and over 100 yards away from the officers, presenting an opportunity to flee or enter another home in the neighborhood. And when Mr. Ceballos entered the garage, disappearing from view, the officers

10

might reasonably have thought that he was retrieving a gun or other weapon.[3] These possibilities were absent in *Allen*.

As Mr. Ceballos's disturbance continued, it diverged further from the situation discussed in *Allen*. There the suspect was sitting in a car and made no threatening gestures until the officers initiated physical contact. *See* p. 10, above. Here, however, it was Mr. Ceballos who initiated the showdown with police officers. After swinging a baseball bat, he walked directly toward the officers, disobeying commands and openly challenging the officers with his bat in hand.

Perhaps if *Allen* were read broadly, the factual differences between *Allen* and our case could be considered immaterial. But a competent officer, making a split-second decision about how to respond to a suspect, could reasonably have interpreted *Allen* more narrowly and viewed the factual differences as material. *See Kisela v. Hughes*, 138 S. Ct. 1148, 1152–54 (2018) (per curiam) (discussing the importance, for qualified

---

[3] Mr. Ceballos never did try to flee, to enter another home, or to retrieve a weapon from the garage. But we analyze whether the use of force was reasonable "from the perspective of a reasonable officer on the scene." *Estate of Larsen* ex rel. *Sturdivan v. Murr*, 511 F.3d 1255, 1259 (10th Cir. 2008). And a reasonable officer had no way of knowing whether Mr. Ceballos had retrieved another weapon from the garage or was going to endanger others in the neighborhood. *See Fisher v. City of San Jose*, 558 F.3d 1069, 1084 (9th Cir. 2009) (en banc) ("The law recognizes that officers on the scene cannot predict future events with the clarity which we, as judges, can review the past."). Even viewed charitably, Mr. Caballos's behavior appeared erratic, dangerous, and unpredictable.

11

immunity, of the need for police officers to make split-second decisions about a suspect's threat to others).

A narrow interpretation of *Allen* is supported by our opinions in *Thomson v. Salt Lake County*, 584 F.3d 1304 (10th Cir. 2009), and *Clark v. Colbert*, 895 F.3d 1258 (10th Cir. 2018).[4] In *Thomson*, the police received a night-time report that a man had threatened a woman with a rifle, was likely armed and potentially suicidal, and was loose in a residential neighborhood. 584 F.3d at 1310. The officers searched the neighborhood and released a police dog to assist. *Id.* Once the suspect was located, the officers surrounded him and ordered him to drop his rifle. *Id.* But instead of dropping the rifle, the suspect pointed it at the officers. *Id.* at 1311. The officers shot him while he was holding his rifle upward, near and toward his own head. *Id.* We concluded that the officers' conduct did not violate the Fourth Amendment. *Id.* at 1322.

In *Clark*, a man called the police because his mentally ill brother was suffering an episode and wielding a knife. 895 F.3d at 1261. The responding officers found the suspect standing on the porch of his home,

---

[4]    We assess qualified immunity "in light of the legal rules that were 'clearly established' at the time [the action] was taken." *Wilson v. Layne*, 526 U.S. 603, 614 (1999). *Clark* was issued after Officer Husk had shot Mr. Ceballos. But we may "examine cases published after [an action was taken] to the extent they shed light on the fact that the law was not clearly established at the relevant time." *Herrera v. City of Albuquerque*, 589 F.3d 1064, 1071 (10th Cir. 2009) (quoting *Swanson v. Town of Mountain View*, 577 F.3d 1196, 1200 (10th Cir. 2009)).

visibly irritated and holding a knife. *Id.* at 1262. Rather than submit to arrest, the suspect kept his knife and made threatening gestures toward the officers. *Id.* At no point did the suspect attempt to leave the porch or get within striking distance of the officers. *Id.*

The officers requested assistance from another police department. Once all the officers arrived, they formed a plan and carried it out. *Id.* Rather than observe the suspect from a distance and let him calm down, the officers confronted him by firing a chemical irritant. *Id.* But the chemical irritant provoked the suspect, and he charged the officers with the knife in hand. *Id.* The officers then tried tasing; when these efforts failed, they shot him several times. *Id.* at 1263. The suspect argued that using any more force was unreasonable because he had already been "contained" and posed no immediate threat to anyone. *Id.* We disagreed, concluding that the officers' decision to deploy the irritant did not violate the Fourth Amendment. *Id.* at 1262–64.[5]

*Thomson* and *Clark* bear some substantial similarities to our case. The *Thomson* suspect was in a residential neighborhood; Mr. Ceballos was, too. He had not strayed beyond his driveway, but who knew what he would do next? Only moments earlier, he had been swinging his baseball bat

---

[5] In *Clark*, we distinguished *Allen* based on factual differences in what the officers had done in the runup to the confrontation. *Clark*, 895 F.3d at 1264.

13

while threatening the police. Even after leaving the garage, he refused to drop the bat as he approached the officers. Officer Husk could reasonably fear that Mr. Ceballos could strike at any moment or endanger neighbors who happened to walk by or to come outside.

Likewise, *Clark* bears similarities to our case. There the suspect had stayed on his porch (*see* p. 13, above); and here, Mr. Ceballos had not left his property. Thus, the officers in both *Clark* and our case might have avoided the use of any force by declining to engage the suspect.

At the same time, however, both *Thomson* and *Clark* bear some differences with our case. The differences with *Thomson* include the weapon: Mr. Ceballos had a baseball bat, and the *Thomson* suspect had a gun. Both the baseball bat and gun could inflict deadly force, but the gun could be used from a greater distance. In *Thomson* the officers also needed to find the suspect, and Officer Husk was able to keep Mr. Ceballos within sight except for his brief trip to the garage.

*Clark* also bears some differences with our case. For example, Officer Husk arguably acted less cautiously than the officers in *Clark*, who gathered backup and formed a plan of engagement before escalating the use of force. *See* p. 13, above.

*Allen*, *Thomson*, and *Clark* share some similarities and dissimilarities to the situation confronting Officer Husk. On the one hand, a reasonable officer could view Mr. Ceballos's behavior as akin to the behavior of the

14

*Allen* suspect, seated in his car. On the other hand, a reasonable officer could liken Officer Husk to the officers who had confronted the suspect in *Thomson*. This perspective would find support in our subsequent analysis in *Clark*.

*Allen* suggested that Officer Husk might be acting recklessly by entering the driveway, and *Thomson* and *Clark* suggested that Officer Husk could lawfully approach Mr. Ceballos. The underlying issue is how broadly or narrowly an officer should have interpreted *Allen* in light of guidance from our other opinions. Some officers might read *Allen* broadly based on the court's reasoning; others might read *Allen* more narrowly based on its underlying facts.

We addressed a similar situation in *Apodaca v. Raemisch*, 864 F.3d 1071 (10th Cir. 2017). There qualified immunity turned on how an officer should read one of our prior opinions (*Perkins v. Kansas Department of Corrections*, 165 F.3d 803 (10th Cir. 1999)). *Apodaca*, 864 F.3d at 1074, 1078–79. We concluded that the availability of differing interpretations was enough to trigger qualified immunity:

> Which reading of *Perkins* is correct? For now, it is enough to conclude that the question is within the realm of reasonable debate, for *Perkins* can be read either expansively or narrowly.
>
> The availability of conflicting interpretations is unsurprising in light of our competing principles guiding interpretations like *Perkins*. On the one hand, the language of a judicial decision must be interpreted with reference to the

15

> circumstances of the particular case and the question under consideration . . . .
>
> But on the other hand, the discovery of what facts are material in any decision is by no means easy. Generally, we ascertain the materiality of individual facts based on which ones are emphasized in a given opinion.

*Id.* at 1078–79 (internal quotation marks and citations omitted).

As in *Apodaca*, the governing precedent (*Allen*) can be read broadly or narrowly. We have distinguished *Allen* four times in cases upholding qualified immunity after police shootings. *See Pauly v. White*, 874 F.3d 1197, 1223 (10th Cir. 2017) (stating that *Allen* "is of little help" on qualified immunity "because the facts are completely different"); *Medina v. Cram*, 252 F.3d 1124, 1132–33 (10th Cir. 2001) (distinguishing *Allen* because that case turned on a material dispute regarding eyewitness testimony and turned on "the typical summary judgment standard" rather than the plaintiff's stricter burden to justify qualified immunity); *Estate of Bleck v. Alamosa*, 643 F. App'x 754, 756–57 (10th Cir. 2016) (unpublished) (upholding summary judgment for police officers in part because *Allen* was distinguishable when the suspect was "volatile, intoxicated, and possibly armed"); *Estate of Ronquillo v. City & Cty. of Denver*, 720 F. App'x 434, 441 (10th Cir. 2017) (unpublished) (distinguishing *Allen* based in part on differences involving the reasonableness of the police conduct). We also distinguished *Allen* in a fifth opinion upholding qualified immunity. *Lord v. Hall*, 520 F. App'x

687, 693 (10th Cir. 2013) (unpublished). Though this case did not involve a police shooting, it did involve a claim of excessive force. There too we relied on the plaintiff's burden to overcome qualified immunity (a burden absent in *Allen*) and the absence of a material factual dispute over the officers' conduct prior to the use of force. *Id.* Given these five opinions and similar factual distinctions between our own case and *Allen*, Officer Husk's use of force did not reflect plain incompetence or a knowing violation of the law. *See* pp. 5–6, above. So his decision to confront Mr. Ceballos did not violate a clearly established constitutional right.

## III.    The Use of Deadly Force

The plaintiffs have not identified an opinion recognizing a Fourth Amendment violation for the use of deadly force in similar circumstances.[6] But our precedent might have clearly established a constitutional violation if the use of force had obviously been excessive. *See* pp. 4–5, above. We should thus consider the four factors bearing on the immediacy and severity of the danger to Officer Husk when he confronted Mr. Ceballos.

---

[6]    As the majority notes, the plaintiffs did not argue on appeal that Officer Husk's conduct would have been obviously unconstitutional even in the absence of a precedent involving materially similar conduct. *See Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) (once qualified immunity has been invoked, the burden shifts to the plaintiff to establish that a clearly established right was violated). But Officer Husk did argue that our general precedents had not established the illegality of his conduct with obvious clarity. Given Officer Husk's appellate argument, I have addressed it.

*See Estate of Larsen* ex rel. *Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008); *see also* p. 3, above. In considering these factors, we must consider the district court's factual findings and reasonable assumptions drawn from the summary judgment evidence. *See* p. 2, above.

*Whether Officer Husk ordered Mr. Ceballos to drop his weapon and whether Mr. Ceballos complied.* The first factor supports Officer Husk. He shouted multiple orders for Mr. Ceballos to drop the baseball bat; Mr. Ceballos heard these commands and responded, but he refused to comply.

*Whether any hostile motions were made toward Officer Husk.* This factor is less clear-cut. The district court did not find that Mr. Ceballos was swinging the baseball bat as he approached the officers. In isolation, this fact might undercut the need for deadly force.

But a reasonable officer could perceive an immediate threat when Mr. Ceballos ignored multiple commands to drop the bat, challenged the officers, and continued toward the officers. *See Estate of Larsen* ex rel. *Sturdivan v. Murr*, 511 F.3d 1255, 1263 (10th Cir. 2008) (stating that disregard of police commands and walking toward officers, while wielding a weapon, constituted hostile actions). Even if Mr. Ceballos had stopped swinging the baseball bat, Officer Husk could reasonably perceive a continued threat to his safety. If this factor points either way, it would support Officer Husk.

18

*The distance separating Officer Husk and Mr. Ceballos.* The third factor calls for an examination of the distance separating the officers from the suspect. We have declined to adopt a bright-line rule requiring that the suspect be within striking distance before an officer may use force. *Id.* at 1262. Mr. Ceballos was between 12 and 20 feet from Officer Husk when the gun was fired. We have regarded similar distances as sufficient to create an immediate threat to officers. *See id.* (finding that an officer's use of deadly force was reasonable when a suspect armed with a knife was between 7 and 20 feet away).

It is true that Mr. Ceballos was carrying a baseball bat rather than a gun. And a gun can injure or kill from further away than a baseball bat. *Cf. Perez v. Suszczynski*, 809 F.3d 1213, 1220 (11th Cir. 2016) ("[A] person standing six feet away from an officer with a knife may present a different threat than a person six feet away with a gun."). Even under the district court's factual findings and reasonable assumptions, however, Officer Husk couldn't have known whether Mr. Ceballos was within seconds of landing a blow with his baseball bat.

The parties disagree on how quickly Mr. Ceballos was moving. But all parties recognize that Mr. Ceballos was closing the distance between himself and Officer Husk, shortening the window of time before Officer Husk would be within striking distance of the baseball bat. Our precedent did not require Officer Husk to wait until he was within reach of the

19

baseball bat. *See Estate of Larsen*, 511 F.3d at 1260 ("A reasonable officer need not await the 'glint of steel' before taking self-protective action; by then it is 'often . . . too late to take safety precautions.'" (quoting *People v. Morales*, 603 N.Y.S.2d 319, 320 (N.Y. App. Div. 1993))). The third factor thus supports Officer Husk.

*The manifest intentions of Mr. Ceballos*. The final factor also supports Officer Husk. Mr. Ceballos was approaching the officers with a baseball bat and shouting threats. This conduct suggested an intent to harm the officers.

*The totality of circumstances*. Under the four factors, a reasonable officer may not have regarded deadly force as an obvious violation of the Fourth Amendment. Even under the district court's factual findings and reasonable assumptions, the four factors could provide reasonable support for Officer Husk's decision to shoot. *See Apodaca v. Raemisch*, 864 F.3d 1071, 1076 (10th Cir. 2017). Because the factors do not establish a Fourth Amendment violation with obvious clarity, any potential constitutional violation would not have been clearly established.

The Supreme Court addressed similar facts in *Kisela v. Hughes*, 138 S. Ct. 1148 (2018) (per curiam). There a police officer shot a suspect who had reportedly acted erratically and was carrying a kitchen knife about six feet away from her roommate amid a heated disagreement. *Kisela*, 138 S.

20

Ct. at 1150–51. The Supreme Court held that the police officer was entitled to qualified immunity. *Id.* at 1152. The Court explained:

> [The police officer] had mere seconds to assess the potential danger to [the roommate]. He was confronted with a woman who had just been seen hacking a tree with a large kitchen knife and whose behavior was erratic enough to cause a concerned bystander to call 911 and then flag down [two police officers]. [The police officer who ultimately fired the gun] was separated from [the suspect and roommate] by a chain-link fence; [the suspect] had moved to within a few feet of [the roommate]; and she failed to acknowledge at least two commands to drop the knife. Those commands were loud enough that [the roommate], who was standing next to [the suspect], heard them. This is far from an obvious case in which any competent officer would have known that shooting [the suspect] to protect [the roommate] would violate the Fourth Amendment.

*Id.* at 1153.[7]

Here, as in *Kisela*, the police officer had only seconds to assess the risk. In *Kisela*, as here, the suspect had a weapon other than a gun. And in both cases, the suspects ignored police commands to drop the weapon. These circumstances led the Supreme Court in *Kisela* to conclude that a reasonable police officer could have perceived an immediate threat. *Id.* at 1153–54. The same is true here. *See Meyers v. Baltimore Cty.*, 713 F.3d 723, 732–33 (4th Cir. 2013) (holding that an officer was justified in shooting a suspect with a taser three times when the suspect was holding a baseball bat and advancing toward the officers, posing an immediate threat

---

[7]     *Kisela* was decided after Officer Husk had shot Mr. Ceballos. But we can consider *Kisela* as evidence that the law had not been clearly established when Officer Husk acted. *See* note 4, above.

21

to the officers' safety); *see also Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997) (per curiam) ("[A]fter facing [the suspect] with an upraised baseball bat, [the officer] could reasonably have supposed that [the suspect] presented some sort of danger to others' safety.").

## IV. Conclusion

We should reverse the district court's denial of summary judgment to Officer Husk on the issue of qualified immunity. The district court erroneously concluded that Officer Husk's conduct violated a clearly established constitutional right. Because the majority upholds this ruling, I respectfully dissent from Part II(A) of the majority opinion.